UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS


~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**HIGH VOLTAGE ENGINEERING
CORPORATION, et al.,**
      Reorganized Debtors

Chapter 11
Case No. 05-10787-JNF
(Substantively Consolidated)

~~~~~~~~~~~~~~~~~~~~~~~~~~


**MEMORANDUM**


**I. INTRODUCTION**

The contested matter before the Court presents the issue of whether this Court should grant a motion to vacate final, non-appealable orders it entered allowing compensation to certain professionals employed in the Debtors' prior Chapter 11 cases. The professionals whose fee awards have been challenged have raised a number of defenses which, if accepted, will compel denial of the motion and termination of the contested matter.

On November 9, 2005, prior to the entry of the order confirming his First Amended Plan of Liquidation under Chapter 11 of the Bankruptcy Code, as modified, the Chapter 11 Trustee of High Voltage Engineering Corporation and its affiliated debtors (collectively, the "Debtor" or "Debtors") filed a Motion to (I) Vacate Orders of Court and (II)

1

Reconsider Administrative Expense Claims of Professionals (the "Motion to Vacate"). The Chapter 11 Trustee filed an identical pleading on the same day in <u>High Voltage Engineering Corporation, et. al.</u>, Case No. 04-11586-JNF (Jointly Administered), the previous jointly administered and substantively consolidated Chapter 11 cases filed by the Debtors. The prior cases, which were filed on March 1, 2004, were pending when the above captioned cases were filed on February 8, 2005.

The Chapter 11 Trustee's Motion to Vacate precipitated the filing of numerous oppositions, memoranda, affidavits, exhibits, and other pleadings. The Court has conducted several hearings to address the issues raised by the parties in the resulting contested matter.

Although the Chapter 11 Trustee filed the Motion to Vacate, his successor, the Liquidating Trustee of the High Voltage Engineering Trust, which was established by and for the benefit of the equity interest holders of High Voltage Engineering Corporation and its affiliated debtor corporations pursuant to the Chapter 11 Trustee's confirmed First Amended Plan, filed Supplements to the Motion to Vacate on August 15, 2006 and on September 15, 2006. The Liquidating Trustee's pleadings were filed shortly after the August 1, 2006 Effective Date of the First Amended Plan, which this Court confirmed on July 10, 2006.

The Court heard the Motion to Vacate, as supplemented, and oppositions to the Motion to Vacate filed by Fried, Frank, Harris, Shriver and Jacobson LLP ("Fried Frank"), Stroock & Stroock & Lavan LLP ("Stroock"), Evercore Restructuring L.L.C. ("Evercore"),

and Jefferies & Company, Inc. ("Jefferies") (collectively, the "2004 Professionals") on

November 15, 2005 and took the Motion to Vacate under advisement. The specific issues

presented include 1) whether the Liquidating Trustee has satisfied his burden under Fed.

R. Civ. P. 60(b), made applicable to this contested matter by Fed. R. Bankr. P. 9024, to

obtain from this Court an order vacating the orders entered on November 9, 2004 in the

Debtors' prior cases awarding compensation to Fried Frank, as counsel to the 2004 Debtors,

to Stroock, as counsel to the Official Committee of Unsecured Creditors in the 2004 cases,

to Evercore, as Financial Advisor to the 2004 Debtors, and to Jefferies, as Financial Advisor

to the Official Committee of Unsecured Creditors in the 2004 cases;[1] and 2) whether the

affirmative defenses to the Motion to Vacate raised by the 2004 Professionals bar the relief

requested by the Liquidating Trustee. For the reasons set forth below, the Court concludes

that the Liquidating Trustee failed to satisfy his burden under Rule 60(b) and is barred

from seeking the relief requested in the Motion to Vacate.

## II. BACKGROUND

On March 1, 2004, High Voltage Engineering Corporation and certain of its

subsidiaries filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

Less than six months later, on July 21, 2004, the Court confirmed the 2004 Debtors' Third

Amended Joint Chapter 11 Plan of Reorganization which became effective on August 10,

---

[1] The orders were dated November 8, 2004. They were not entered on the court docket until November 9, 2004. Accordingly, the appeal period with respect to the orders commenced on November 9, 2004, as well as the one year period set forth in Rule 60(b). *See* Fed. R. Bankr. P. 8002(a), Fed. R. Bankr. P. 9024, and Fed. R. Civ. P. 60(b).

2004.

The Chapter 11 Trustee outlined the circumstances which precipitated the filing of

the 2004 cases in his First Amended Disclosure Statement filed on May 17, 2005. He stated:

> In 1997, pursuant to an indenture between HVE [High Voltage Engineering Corporation] and State Street Bank and Trust Company (the "Indenture"), HVE issued $155 million of 10 ½% senior notes (the "Senior Notes"). Subsequently, the Indenture was amended to increase the interest on the Senior Notes to 10 ¾%. Interest on the Senior Notes was payable semiannually, on February 15 and August 15 of each year.
>
> On November 30, 2000, HVE and certain of its subsidiaries and affiliates, including certain other entities that have since been sold, dissolved or merged into HVE, and Ableco Finance LLC ("Ableco") entered into a Financing Agreement (the "Ableco Financing Agreement"). The Ableco Financing Agreement provided HVE with a $25 million revolving credit facility, which was to mature on October 31, 2003. Between 2000 and 2003, HVE's financial health declined. HVE did not make the interest payments due on account of the Senior Notes in August 2003 or February 2004. The maturity date was extended to March 1, 2004 by agreement between Ableco and HVE.
>
> In August 2003, HVE began discussion with the ad hoc committee of holders of the Senior Notes (the "Unofficial Committee of Noteholders"). The Unofficial Committee of Noteholders retained Jefferies and Company, Inc. ("Jefferies") as its financial advisor and Ropes & Gray LLP ("Ropes") as its counsel to assist it with respect to discussions with the Debtors concerning the restructure of the Senior Notes. HVE retained Evercore Restructuring L.P. ("Evercore") as its financial advisor and Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank") along with Goulston & Storrs PC ("Goulston") as its counsel in connection with their restructuring efforts.
>
> HVE's negotiations with the Unofficial Committee of Noteholders resulted in a restructuring agreement (the "Restructuring Agreement") dated as of February 18, 2004, by and among (1) Clifford Press, the owner of all or substantially all of the issued and outstanding shares of Letitia Corporation (which at that time owned substantially all of the issued and outstanding shares of HVE) and, at the time, HVE's President and Chairman, (2) holders of in excess of 53% of the Senior Notes and (3) HVE. Pursuant to the Restructuring Agreement, HVE agreed that it and certain of its subsidiaries

4

would file petitions for relief under Chapter 11 of the Bankruptcy Code, then propose a plan of reorganization pursuant to which holders of Senior Notes (collectively, the "Senior Noteholders") would receive substantially all of the new equity in the reorganized HVE in exchange for the Senior Notes and the Debtors' trade creditors would be paid in full.

Shortly after filing their voluntary petitions on March 1, 2004, the Debtors, with this Court's authority, employed Fried Frank and Evercore, and the Official Committee of Unsecured Creditors employed Stroock and Jefferies. The Court authorized the employment of several other professionals, and an Ad Hoc Committee of Noteholders was active in the 2004 cases.

During the 2004 cases, the Debtors satisfied their obligations under the Ableco Financing Agreement through a senior secured term loan obtained from certain holders of the Senior Notes. *See* March 29, 2004 Final Order (I) Authorizing Secured and Super-Priority Post-Petition Financing and Use of Cash Collateral pursuant to 11 U.S.C. §§ 363, 364, and 507(b), (II) Modifying Automatic Stay under 11 U.S.C. § 362, and (III) Granting Other Related Relief. Moreover, the 2004 Debtors proceeded expeditiously to implement the Restructuring Agreement. On May 13, 2004, the Debtors' filed a Third Amended Joint Chapter 11 Plan of Reorganization, accompanied by an Amended Disclosure Statement in which they outlined the terms of their proposed plan. They represented the following:

> On the Effective Date, title to all property of the Debtors' estates will pass to and vest in the applicable Reorganized Debtor, free and clear of all Claims, Interests, Liens, security interests, charges and other encumbrances (except as otherwise provided in the Plan). Confirmation of the Plan (subject to the occurrence of the Effective Date) will be binding, and the Debtors' debts will, without in any way limiting Section 12.01 of the Plan, be discharged as provided in Section 1141 of the Bankruptcy Code.

The order of confirmation reiterated this provision.  Both the Plan and the order of

confirmation provided that the 2004 Reorganized Debtors, as representatives of the

Chapter 11 estates of the Debtors, would retain the exclusive right to enforce any and all

causes of action of the Debtors. Nevertheless, the Debtors in their Amended Disclosure

Statement indicated that they or the Reorganized Debtors would release any and all causes

of action arising under 11 U.S.C. §§ 510, 542, 544-550, and 553, as well as all other causes

of action of a trustee and debtor in possession except with respect to disputed claims.

> With respect to the claims of the Senior Noteholders, the 2004 Debtors represented:

> On the Effective Date, the Pre-Petition Senior Note Claims will be
> extinguished and each holder of an Allowed Pre-Petition Senior Note Claim
> will receive its *pro rata* share of 97% of the common stock of the Reorganized
> Debtors, subject to dilution by the issuance of options pursuant to the
> Management Incentive Plan and the warrants issued under the Plan. Each
> holder of an Allowed Pre-Petition Senior Note Claim receiving New
> Common Stock pursuant to the Plan will be deemed to be bound by the
> Shareholders Agreement whether or not such holder executes the
> Shareholders Agreement.

The 2004 Debtors also described the treatment afforded the Pre-Petition Senior Note claims,

which they indicated were allowed in the aggregate amount of $172.8 million:

> On the Effective Date, all Pre-Petition Senior Note Claims will be
> extinguished, and each holder of an Allowed Pre-Petition Senior Note Claim
> will be entitled to receive its pro rata share of the Senior Note Distribution.
> Such pro rata shares will be determined by the ratio between the amount of
> such holder's Allowed Pre-Petition Senior Note Claim and the aggregate
> amount of all Allowed Pre-Petition Senior Note Claims. Each holder of an
> Allowed Pre-Petition Senior Note Claim receiving New Common Stock
> pursuant to the Plan will be deemed to be bound by the Shareholders
> Agreement whether or not such holder executes the Shareholders
> Agreement.

Under the 2004 Debtors' Third Amended Plan, unsecured creditors were to be paid 100%

of their allowed general unsecured claims within 90 days of the Effective Date.

In summary, to implement the Third Amended Plan of Reorganization, the Debtors proposed to cancel the Pre-Petition Senior Notes and Indenture, as well as the old common and preferred stock and other interests on the Effective Date. Under the Reorganized HVE's Amended and Restated Certificate of Incorporation, Reorganized HVE's authorized capital stock was to consist of 2,000,000 shares of New Common Stock of which approximately 1,000,000 shares were to be issued and outstanding and 100,000 were to be reserved for a management incentive plan. As of the Effective Date, approximately 970,000 shares were to be issued to the holders of allowed Pre-Petition Senior Note Claims.

In furtherance of their Plan, the 2004 Debtors created a new, five-member board of directors comprised of the Chief Executive Officer and four members selected by the members of the Unofficial Committee of Noteholders. Counsel to the Ad Hoc Committee of Noteholders represented that it played "a central role in the selection of the New Board of Directors." Moreover, certain members of the Ad Hoc Committee provided debtor-in-possession financing and, additionally, exit financing to the Debtors and Reorganized Debtors. Indeed, the Senior Noteholders, through their counsel, attended most, if not all, hearings in the 2004 cases. Thus, both before and after confirmation of the Debtors' Third Amended Plan, the Senior Noteholders must be deemed to have had substantial knowledge of the financial condition of the 2004 Debtors.

The Third Amended Plan contained extensive release provisions, which were incorporated into the order of confirmation. Specifically, the Plan provided the following:

7

. . . In addition, but in no way limiting the generality of the foregoing, any Entity receiving any distribution pursuant to this Plan will be presumed conclusively to have released the Debtors, the Reorganized Debtors, the Subsidiaries, the Unofficial Committee of Noteholders, the Creditors' Committee, the DIP Lenders, the DIP Agent and the Committees, the present and former members of any of the foregoing (together with the advisory affiliates and advised affiliates of such members), their respective successors, assigns, and each of their respective present and former directors, shareholders, officers, agents, attorneys, advisors, accountants, financial advisors, investment bankers and employees and any Entity claimed to be liable derivatively through any of the foregoing, from any Cause of Action based on the same subject matter as the Claim or Interest on which the distribution is received; provided, however, unless otherwise agreed to by the Debtors, the Creditors' Committee and the Unofficial Committee of Noteholders, Mr. Levy shall not be released pursuant to this provision. The release described in the preceding sentence will be enforceable as a matter of contract against any Entity that accepts any distribution pursuant to this Plan.

. . . Additionally, except as otherwise specifically provided by this Plan or the Confirmation Order, the confirmation of this Plan (subject to the occurrence of the Effective Date) shall act as a discharge and release of all Causes of Action (including without limitation, Causes of Action of a trustee and debtor in possession under the Bankruptcy Code) of the Debtors and Reorganized Debtors, whether known or unknown, against: (i) their present and former directors, shareholders, officers and employees (other than for money borrowed from the Debtors or the Reorganized Debtors by such shareholders, directors, officers or employees or any money owed to the Debtors or Reorganized Debtors by such shareholders, officers, directors or employees that is evidenced by a note, debenture or other instrument), agents, attorneys, advisors, accountants, financial advisors, investment bankers; (ii) the Unofficial Committee of Noteholders, the Creditors' Committee, each in such capacity, and their respective present and former members and the present and former affiliates, officers, directors, shareholders, attorneys, accountants, financial advisors, investment bankers, advisory affiliates, employees, agents, successors and assigns of each of the Unofficial Committee of Noteholders, the Creditors' Committee and their respective present and former members; (iii) the present and former holders of the Pre-Petition Senior Notes, each in such capacity, and their respective present and former affiliates, officers, directors, shareholders, attorneys, accountants, financial advisors, investment bankers, advisory affiliates, employees, agents, successors and assigns; (iv) the DIP Agent and DIP

Lenders and their respective present and former affiliates, officers, directors, shareholders, attorneys, accountants, financial advisors, investment bankers, advisory affiliates, employees, agents, successors and assigns; and (v) any Entity claimed to be liable derivatively through any of the foregoing; provided, however, unless otherwise agreed to by the Debtors, the Creditors' Committee and the Unofficial Committee of Noteholders, the Debtors shall not release the Causes of Action with respect to Mr. Levy. Notwithstanding the generality of the foregoing, nothing in the Plan shall release any claims of any Debtors or Reorganized Debtors, as the case may be, against any Subsidiaries that are not Debtors or Reorganized Debtors, as the case may be.

. . . <u>Exculpation</u>. The Debtors, the Reorganized Debtors, the Unofficial Committee of Noteholders and its members, the Creditors' Committee and its members, the DIP Lenders, the DIP Agent, and each of the respective present and former officers, directors, members, employees, and agents of the foregoing (including any professionals retained by such persons or entities) will have no liability for any act or omission in connection with, or arising out of, the pursuit of approval of the Disclosure Statement or this Plan or the solicitation of votes for or confirmation of the Plan, or the consummation of the Plan, or the transactions contemplated and effectuated by the Plan or the administration of the Plan or the property to be distributed under the Plan, or any other act or omission during the administration of the Debtors' estates or in contemplation of the Chapter 11 Cases except for gross negligence or willful misconduct as determined by a Final Order of the Court, and in all respects, will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

This Court confirmed the 2004 Debtors' Third Amended Joint Plan of Reorganization on July 21, 2004. The Plan provided for substantive consolidation of the Debtors' cases for purposes of the Plan and distributions and other transactions under the Plan, and it became effective on August 10, 2004. One hundred percent of Class 3, comprised of the Pre-Petition Senior Noteholders, voted to accept the Plan. Additionally, pursuant to the order of confirmation, on the Effective Date, the Creditors' Committee ceased to exist and its members and agents, including attorneys and financial advisors, were released and discharged from all further authority, duties, responsibilities and

9

obligations relating to and arising from the Chapter 11 cases, except with respect to the preparation and prosecution of fee applications.

On August 10, 2004, the Debtors filed a pleading, captioned "Notice of Debtors' Filing of Exit Financing Credit Agreement and Related Financial Information," which was signed by both the Debtors' Chief Financial Officer, Joseph W. McHugh, Jr. and a representative of the Royal Bank of Canada, the Lenders' agent. The Lenders included several Senior Noteholders, namely Senior High Income Portfolio, Inc., Master Senior Floating Rate Trust, Floating Rate Income Strategies Fund, Inc., Debt Strategies Fund, and Credit Suisse First Boston International.

In summary, the Senior Noteholders converted their unsecured debt to equity becoming holders of New Common Stock in the Reorganized Debtors as well as the majority owners of High Voltage Engineering Corporation. Their involvement with the Debtors preceded the filing of the petitions on March 1, 2004 and, obviously, continued after the Effective Date, particularly as certain members of the Ad Hoc Committee, which its counsel noted was comprised of "a number of financial institutions, mutual funds, investment companies, hedge funds, investment advisors, or other entities," provided the exit financing disclosed in the August 10, 2004 Notice. To reiterate, the Senior Noteholders, through their representatives on the Board of Directors, necessarily must be deemed to have had substantial and intimate knowledge of the Debtors' financial condition, including its projections, both at the time of confirmation and at the time the Court entered its November 9, 2004 order awarding compensation to the 2004 Professionals.

Following the August 10, 2004 Effective Date, the Reorganized Debtors engaged new counsel, Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"). Goulston & Storrs, P.C., local counsel to the 2004 Debtors, however, continued to play an active role in the claims objection process up until February 8, 2005 when the Reorganized Debtors filed the petitions commencing the second Chapter 11 cases. Additionally, the Reorganized Debtors employed Jefferies as their financial advisors.

The 2004 Debtors were obligated to make, and indeed made, three payments totaling approximately $15.8 million to the holders of pre-petition unsecured claims (Class 4). Additionally, the 2004 Debtors reserved approximately $4.2 million to satisfy outstanding professional fees and administrative claims.

On November 8, 2004, this Court awarded compensation pursuant to the various professionals, including the following:

$2,341,139.71 to Evercore pursuant to its First and Final Application for Allowance of Compensation for Services Rendered and For Reimbursement of Expenses from March 1, 2004 through July 31, 2004;

$1,254,572.04 to Fried Frank pursuant to its Final Application pursuant to Section 330 of the Bankruptcy Code, Bankruptcy Rule 2016 and Local Bankruptcy Rule 2016-1 for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred and Posted from May 1, 2004 through August 10, 2004;

$1,426,865.37 to Jefferies pursuant to its First and Final Application for Allowance of Fees and Expenses as Financial Advisor to the Official Committee of Unsecured Creditors pursuant to section 328(a) and 1103(a) of Title 11 of the U.S. Bankruptcy Code; and

$497,937.03 to Stroock pursuant to its Application for Allowance of Fees and Expenses as Counsel to the Official Creditors' Committee of Unsecured Creditors.

Although not raised by any party, the Court's review of the record of proceedings the 2004 cases revealed a notice problem.  The service of the Notice of Nonevidentiary Hearing containing an objection deadline with respect to the fee applications filed by the 2004 Professionals was inadequate, as the 2004 Professionals failed to serve the Notice of Nonevidentiary Hearing as directed by the Court.  Accordingly, the Court shall *sua sponte* consider whether the defective notice warrants vacatur of the orders. The Court concludes it does not.

On September 24, 2004, the 2004 Professionals filed their fee applications.  The 2004 Professionals did not file certificates of service with their fee applications, although notice of the applications was served electronically on those attorneys eligible to receive electronic notice, including Debtors' counsel,  Goulston & Storrs, P.C., and counsel to the Senior Noteholders, Ropes & Gray, and the United States Trustee.  Moreover, on September 24, 2004, Daniel C. Reiser filed a certificate of service (docketed as #981) certifying that he served copies of the fee applications filed by Stroock and Jefferies on the service list which included the United States Trustee.  On September 28, 2004, an attorney at Goulson & Storrs filed a certificate of service (docketed as #990) showing service of copies of its fee application as well as copies of the fee applications filed by Fried Frank and Evercore on the same service list.  On September 30, 2004, the Court issued a Notice of Nonevidentiary Hearing (docketed as #1002), pursuant to which the 2004 Professionals and others, including Ropes & Gray, were advised to serve a copy of the Notice, setting forth a November 9, 2004 hearing date and an October 18, 2004 date for objections, forthwith and

to file within 7 days of receipt a certificate of service. On October 1, 2004, Ropes & Gray

complied with the provisions of the Notice of Nonevidentiary Hearing by filing a certificate

of service (docketed as #1003). On the same day, the bankruptcy noticing center served a

copy of the Notice of Nonevidentiary Hearing (docketed as #1005) on the United States

Trustee and several attorneys, including counsel to the 2004 Professionals, by first class

mail.[2]

----

[2] The certificate of service recites:
The following entities were served by first class mail on Oct 02, 2004.
aty +Christine D. Lynch, Goulston & Storrs, PC, 400 Atlantic Avenue, Boston, MA 02110-3333
aty +Christopher J. Panos, Craig and Macauley, P.C., 600 Atlantic Avenue, Federal Reserve Plaza, Boston, MA 02210-2204
aty Douglas Mannal, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, NY 10038-4982
aty Eric M. Kay, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, NY 10038-4982
aty Michael J Sage, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, NY 10038-4982
aty Peter D Bilowz, Goulston & Storrs, P.C., 400 Atlantic Avenue, Boston, MA 02110-3333
aty +Vivek Melwani, Fried, Frank, Harris, Shriver & Jacobson, One New York Plaza, New York, NY 10004-1980
aty +William B. Forbush, III, Piper Rudnick LLP, One International Place, 21st Floor, New York, NY 02110-2600
ust +John Fitzgerald, Office of the US Trustee, 10 Causeway Street, Boston, MA 02222-1043
crcm +Christopher J. Panos, Craig and Macauley P.C., 600 Atlantic Avenue, Boston, MA 02210-2215
aud +Grant Thornton, LLP, 226 Causeway Street, Boston, MA 02114-2156
crcm Sanjai Bhonsle, Smoky River CDO L.P., c/o RBC Capital Parnters, One Library Plaza, 5th Floor, New York, NY 10006
intp +United States Trustee, Eric K. Bradford, Department Of Justice, 10 Causeway Street, Room 1182, Boston, MA 02222-1047

Although the 2004 Professionals did not comply with the provisions of the Notice of Nonevidentiary Hearing, the Court concludes that notice of the hearing date and of the opportunity to file an objection by October 18th was sufficient under the circumstances of the case, particularly where the unsecured creditors were paid in full and the parties affected by the award of compensation, namely the Senior Noteholders were aware of the hearing date either through their counsel, Ropes & Gray, or through the involvement of Goulston & Storrs, P.C. Moreover, neither the Chapter 11 Trustee nor the Liquidating Trustee complained about the inadequacy of the notice in any of the pleadings filed with the Court.

Following the commencement of the 2005 cases, the Debtors filed, among other pleadings, a Motion for Entry of An Order (I) Authorizing the Debtor to (A) Obtain Post-Petition Financing, (B) Grant Liens and Super-Priority Administrative Expense Status, (C) Modify the Automatic Stay, (D) Enter into Post-Petition Financing Agreement and (II) Scheduling a Final Hearing, and an Application to Employ Aiken Gump, as well as other so-called First Day Motions. In these pleadings, they explained the circumstances resulting in the need for further reorganization in six months from the Effective Date. They stated:

> Although the First Plan significantly reduced the debt service requirements of the Debtors by eliminating the Senior Notes, the Debtors still began experiencing serious cash shortages shortly after emerging from bankruptcy. In order to preserve cash and continue to meet their most critical expenses, the Debtors have been forced to delay payments to many of their trade vendors and furlough a number of Robicon's employees. In addition, Robicon has begun requiring payment on a COD basis from ASI [ASIRobicon S.p.A.], a non-debtor foreign subsidiary] before shipping goods to ASI, its affiliate.

14

The Debtors have undergone significant changes in their upper management since emerging from bankruptcy. Russell Shade, HVE's President and CEO, resigned his position effective December 15, 2004 and was replaced by Phillip Martineau. In addition, the Debtors have retained the crisis management firm of Marotta Gund Budd & Dzera, LLC ("Marotta Gund") to assist it by providing interim management and consulting with regard to the Debtors' cash management crisis. Pursuant to this engagement, Charles Schultz, Jr. of Marotta Gund has assumed the role of Interim Chief Financial Officer of HVE effective December 30, 2004.

The Debtors, with the assistance of their advisors, have determined that the best long term solution to the cash shortages they have experienced, and in order to maximize the value for their creditors, protect the job [sic] of their employees, maintain a customer for their vendors and a supplier for their customers, is to sell all or most of their assets through one or more 363 sale processes in these bankruptcy proceedings. Prior to the Petition Date, the Debtors retained Jefferies & Co. to assist them in marketing their assets to likely buyers, and as of the Petition Date, the sales and marketing process was already well underway.

On February 17, 2005, following consideration of various evidentiary submissions made on behalf of the 2005 Debtors, as well as the Objection to the Financing Motion filed on behalf of the Ad Hoc Committee of Equity Holders, in which its counsel represented that the Ad Hoc Committee consisted of several holders of the stock of High Voltage Engineering Corporation, namely "equity holders who collectively own 43% of the outstanding equity of the Debtors: Alpine Capital, Barclays Capital, BASSO Capital Management LLC, Dalton Investments LLC, J. Goldman and Company, Scott's Cove Capital Management LLC and Wilfrid Aubrey LLC," this Court *sua sponte* appointed a Chapter 11 Trustee.

On May 17, 2006, the Chapter 11 Trustee filed a First Amended Disclosure Statement with respect to his First Amended Plan of Liquidation. Through his Plan, the Chapter 11

Trustee proposed to pay all administrative and other claims, secured and unsecured, in full, with interest. Additionally, he anticipated a distribution to equity holders - - the former Senior Noteholders. He described the treatment of Class 4, Equity Interests, as follows:

> Class 4 consists of Equity Interests in HVE. Each Equity Holder shall receive, on account of its Equity Interest, a *Pro Rata Share* of the remaining assets after the Allowed Claims in Classes 1 through 3 have been paid in full, including interest, or sufficient liquid funds have been reserved to pay, in full and with interest, all Disputed Claims if and to the extent that such claims become Allowed Claims. An Equity Holder's *Pro Rata Share* of the Cash available to satisfy Class 4 Equity Interests will be calculated based upon the number of shares of HVE Common Stock held by such Equity Holder as of the Record Date compared with the total number of shares of HVE Common Stock issued and outstanding as of the Record Date. The Trustee estimates that, after Allowed Claims are paid and the Debtors' federal and state tax liabilities are satisfied, there will be approximately $54 to $56 million on hand to distribute to Equity Holders.

Class 4, the only impaired class under the First Amended Plan, voted to accept the Plan. This Court confirmed the Chapter 11 Trustee's First Amended Plan on July 10, 2006. It became effective on August 1, 2006.

Pursuant to the terms of the First Amended Plan, the Official Committee of Unsecured Creditors and the Committee of Equity Security Holders were dissolved, and the Trustee caused each of the Debtors to transfer all of their Causes of Action to the Liquidating Trust established pursuant to the Plan. Additionally, the equity holders were deemed to have transferred all "Beneficiary Claims" to the Liquidating Trust. In accordance with the confirmation order, the Liquidating Trustee, as the legal representative of the Liquidating Trust, was authorized without further order to pursue all Litigation

16

Claims and was "deemed substituted as party in interest in place and stead of the Debtors

and/or Chapter 11 Trustee. . . ."

## III. THE TRUSTEE'S ALLEGATIONS AND THE 2004 PROFESSIONALS' RESPONSES

The Liquidating Trustee summarized his evidence in support of the Motion to

Vacate in a pleading captioned "Liquidating Trustee's Omnibus Memorandum of Law in

Opposition to 2004 Professionals' Motions to Dismiss the Liquidating Trustee's Motion to

(I) Vacate Orders of Court and (II) Reconsider Administrative Expense Claims of

Professionals."    Referencing the Supplement to the Motion to Vacate, which was

accompanied by 62 exhibits and two substantive declarations, one from John Koester, a

member of the Creditors' Committee in the 2004 cases, and the other from Anthony

Walker, a forensic accountant employed by TRG Associates, the Liquidating Trustee stated

the following:

> The financial projections prepared in support of confirmation of the 2004
> Plan and submitted to the Court at the time of confirmation were inaccurate,
> out of date and insupportably aggressive (Supplement ¶¶ 44-46);
>
> The 2004 Professionals knew that the projections submitted to the Court
> proved that the 2004 Plan was not feasible (Supplement ¶78);
>
> Revised projections showing the need for additional funding were prepared
> but those revised projections, which, like the original projections were
> inaccurate, were deliberately not submitted to the Court (Supplement ¶¶ 58-
> 77);
>
> The original exit financing arranged by the 2004 Professionals was grossly
> inadequate (Supplement ¶¶ 47-49);
>
> The 2004 Professionals knew the exit financing was inadequate and they
> were all involved in an effort to obtain replacement financing (Supplement
> ¶¶ 65-74);

Because of concerns over the reliability of financial projections and the adequacy of the financing, the confirmation hearing was adjourned from June 24, 2004 to July 21, 2004 (Supplement ¶¶ 55-57);

The 2004 Professionals did not advise the Court that the reasons for seeking an adjournment of the original confirmation hearing were that (i) the financial projections were unreliable; and (ii) the exit financing then available was inadequate (Supplement ¶¶ 55-57);

New exit financing was obtained just a few days before the adjourned confirmation hearing. The revised exit financing continued to be severely inadequate for the post-confirmation cash requirements of the 2004 Debtors (Supplement ¶¶ 70-72);

The Declaration of Russell Shade, which was submitted to the Court and upon which the 2004 Debtors and 2004 Professionals relied when seeking confirmation of the Third Amended Plan, was inaccurate and out of date, and was never corrected (Supplement ¶¶ 99-105);

The 2004 Plan was not feasible and its ultimate success was dependent on the 2004 Debtors' ability to, inter alia, (i) withhold normal course trade payments to post-confirmation suppliers for at least 90 days, and (ii) avoid providing funds that the 2004 Debtors had committed to provide to their Italian subsidiary (Supplement ¶¶83; 85-93);

At the time the 2004 Professionals' Fee Awards were granted, some or all of the 2004 Professionals knew of the financial crisis the Debtors were suffering but failed to advise the Court of the crisis and instead simply received the fees they were awarded (Supplement ¶¶ 128-135); and

Within weeks of the Fee Awards, the Debtors were already planning for the filing of the second bankruptcy proceeding (Supplement ¶ 127).

The 2004 Professionals responded to the Motion to Vacate both when it was originally filed and after the Liquidating Trustee supplemented it in August and September of 2006 with a barrage of objections.   In summary, the 2004 Professionals argue that the Liquidating Trustee has failed to demonstrate the existence of new evidence warranting relief under Rule 60(b). Specifically, they assert that whether he is considered the successor

of the 2004 Reorganized Debtors or whether he assumed the causes of action outlined in

his Motion to Vacate from the 2004 Debtors, he "stands in the shoes of the Debtors" and

is charged with the knowledge the Debtors had at the time the Court awarded the 2004

Professionals their compensation.

The 2004 Professionals also assert the defense of *in pari delicto,* which they contend

bars the Liquidating Trustee from obtaining relief from a third party for fraud committed

with the participation of the 2004 Debtors.   Additionally, the 2004 Professionals raise,

among other arguments, the binding language of the release and exculpation provisions

set forth in the Third Amended Plan and the July 21, 2004 confirmation order as a bar to

the assertion of claims made by the Liquidating Trustee, citing the principles of res judicata,

collateral estoppel and judicial estoppel, and the doctrine of law of the case, which pertain

to the final order of confirmation.   In their view, the Liquidating Trustee cannot use Rule

60(b) as an "end run" around 11 U.S.C. § 1144, which circumscribes the period in which

and circumstances when a bankruptcy court may revoke an order of confirmation.

## VI. ANALYSIS

### A. Rule 60(b) Standards

Rule 60(b), made applicable to this proceeding by Fed. R. Bankr. P. 9024, provides

in relevant part the following:

> On motion and upon such terms as are just, the court may relieve a party or
> a party's legal representative from a final judgment, order, or proceeding for
> the following reasons: . . . (2) newly discovered evidence which by due
> diligence could not have been discovered in time to move for a new trial
> under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or
> extrinsic), misrepresentation, or other misconduct of an adverse party; . . . or

(6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken. A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation.

Fed. R. Civ. P. 60(b). The Liquidating Trustee initially relied upon Rule 60(b)(2) and (3) in his Supplements to the Motion to Vacate. In his Omnibus Memorandum filed several months later, he adopted a different approach, primarily relying upon Rule 60(b)(6), stating that, in contrast to the provisions of Rule 60(b)(2) and (3), Rule 60(b)(6) "does not implicate the subjective, factual issue of motive, intent, knowledge or state of mind." Omnibus Memorandum, at 22.

The United States Bankruptcy Appellate Panel for the First Circuit in a recent decision made several pertinent observations about Rule 60(b) motions. It stated:

> To prevail on a Rule 60(b) motion, the movant must demonstrate: (1) timeliness, (2) exceptional circumstances justifying relief, and (3) the absence of unfair prejudice to the opposing party. See Shepherds Hill, 316 B.R. at 416; Indian Motocycle, 289 B.R. at 280. Motions brought under Rule 60(b) are committed to the trial court's discretion, and the denial of a Rule 60(b) motion should be reviewed for abuse of discretion with "the understanding that relief under Rule 60(b) is extraordinary in nature and that motions invoking that rule should be granted sparingly." Karak v. Bursaw Oil Corp., 288 F.3d 15, 19 (1st Cir. 2002); see also U.S. Steel v. M. DeMatteo Constr. Co., 315 F.3d 43, 51 (1st Cir. 2002) (citations omitted).

Eastern Sav. Bank v. Lafata (In re Lafata), 344 B.R. 715, 723 (B.A.P. 1st Cir. 2006).

With respect to Rule 60(b)(2), courts are permitted to vacate a judgment based upon "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)." MCI Telecomm'ns Corp. v. Matrix Commc'ns Corp., 135 F.3d 27, 34 (1st Cir. 1998)(citing Hoult v. Hoult, 57 F.3d 1, 5-6 (1st Cir.

20

1995)). "To prevail, a moving party must demonstrate that 'the missing evidence was 'of

such a material and controlling nature as [would] probably [have] change[d] the

outcome.'"Id. at 34 (citing Hoult, at 6) (footnote omitted).

Rule 60(b)(3) lists fraud, misrepresentation "or other misconduct" as grounds for

relief.  In Anderson v. Cryovac, Inc., 862 F.2d 910 (1st Cir. 1988), the United States Court

of Appeals for the First Circuit discussed the concept at length in the context of discovery

abuse.  It observed the following:

> "Misconduct" does not demand proof of nefarious intent or purpose as a
> prerequisite to redress. For the term to have meaning in the Rule 60(b)(3)
> context, it must differ from both "fraud" and "misrepresentation." Definition
> of this difference requires us to take an expansive view of "misconduct." The
> term can cover even accidental omissions--elsewise it would be pleonastic,
> because "fraud" and "misrepresentation" would likely subsume it. Cf.
> United States v. One Douglas A-26B Aircraft, 662 F.2d 1372, 1374- 75 n. 6
> (11th Cir.1981) (to avoid redundancy, "misrepresentation" in Rule 60(b)(3)
> must encompass more than false statements made with intent to deceive).
> We think such a construction not overly harsh; it takes scant imagination to
> conjure up discovery responses which, though made in good faith, are so
> ineptly researched or lackadaisical that they deny the opposing party a fair
> trial. Accidents--at least avoidable ones--should not be immune from the
> reach of the rule. Thus, we find ourselves in agreement with the Fifth Circuit
> that, depending upon the circumstances, relief on the ground of misconduct
> may be justified "whether there was evil, innocent or careless, purpose."
> Bros. Inc. v. W.E. Grace Manufacturing Co., 351 F.2d 208, 211 (5th Cir.1965),
> cert. denied, 383 U.S. 936, 86 S.Ct. 1065, 15 L.Ed.2d 852 (1966).

> Once we leave the starting gate, the borders of the course blur. The concept
> of misconduct seems mutable: not every instance of nondisclosure merits the
> same judicial response. The text of Rule 60(b)(3) gives precious little guidance
> as to how a court should ascertain the existence of misconduct, weigh its
> effect, and ultimately determine when to set aside a verdict. Our sister
> circuits have set some guideposts along the track: the moving party must
> demonstrate misconduct--like fraud or misrepresentation--by clear and
> convincing evidence, and must then show that the misconduct foreclosed full
> and fair preparation or presentation of its case. See, e.g., In re M/V Peacock,

809 F.2d 1403, 1404-05 (9th Cir.1987) (Kennedy, J.); Harre v. A.H. Robins Co., 750 F.2d 1501, 1503 (11th Cir.1985); Stridiron v. Stridiron, 698 F.2d 204, 207 (3d Cir.1983); Square Construction Co. v. Washington Metropolitan Area Transit Authority, 657 F.2d 68, 71 (4th Cir.1981); Rozier, 573 F.2d at 1339. Another well-sculpted marker points out that misconduct need not be result-altering in order to merit Rule 60(b)(3) redress. See Wilson v. Thompson, 638 F.2d 801, 804 (5th Cir.1981); Rozier, 573 F.2d at 1339; Seaboldt v. Pennsylvania Railroad Company, 290 F.2d 296, 299 (3d Cir.1961); see also Bunch v. United States, 680 F.2d 1271, 1283 (9th Cir.1982) (when information withheld in discovery, aggrieved party need not establish that outcome would have been different).

We are in general concert with these authorities, but find it necessary to place our own gloss upon the subject. Verdicts ought not lightly to be disturbed, so it makes very good sense to require complainants to demonstrate convincingly that they have been victimized by an adversary's misconduct. And as with other defects in the course of litigation, the error, to warrant relief, must have been harmful--it must have "affect[ed] the substantial rights" of the movant. Fed. R. Civ. P. 61. Moreover, since parties ought not to benefit from their own mis-, mal-, or nonfeasance, uncertainties attending the application of hindsight in this area should redound to the movant's benefit. See generally Minneapolis, St. Paul, & Sault Ste. Marie Ry. Co. v. Moquin, 283 U.S. 520, 521-22, 51 S.Ct. 501, 502, 75 L.Ed. 1243 (1931) (litigant who engages in misconduct "will not be permitted the benefit of calculation, which can be little better than speculation, as to the extent of the wrong inflicted upon his opponent").

862 F.2d at 923-24 (footnotes omitted).  The First Circuit also observed in a footnote the following:

This standard is more lenient than its Rule 60(b)(2) counterpart, and properly so. The "newly discovered evidence" provision of Rule 60(b)(2) is aimed at correcting erroneous judgments stemming from the unobtainability of evidence. Consequently, a party seeking a new trial under Rule 60(b)(2) must show that the missing evidence was "of such a material and controlling nature as [would] probably [have] change[d] the outcome." 7 J. Moore & J. Lucas, Moore's Federal Practice (2d ed. 1985) ¶ 60.23[4] at 60:201-02 (footnote omitted); see also Federal Deposit Insurance Corp. v. La Rambla Shopping Center, 791 F.2d 215, 223-24 (1st Cir.1986). In contrast, Rule 60(b)(3) focuses not on erroneous judgments as such, but on judgments which were unfairly procured. . . .

Id. at 924 n.10.  *See also* Gaw v. Sappett, 62 Mass. App. Ct. 405 (2004).  In Lafata, the

bankruptcy appellate panel summarized the requirements of Rule 60(b)(3) motions: the

movant must demonstrate the alleged misrepresentations or misconduct by clear and

convincing evidence and must demonstrate that the alleged misrepresentations or

misconduct prevented it from fully and fairly presenting its case. 344 B.R. at 724 (citations

omitted).

Rule 60(b)(6), the last provision upon the Liquidating Trustee relies, is a "catch all"

provision. It "may not be used as a back-door substitute for an omitted appeal, and, in all

but the most exceptional circumstances, a party's neglect to prosecute a timeous appeal will

bar relief under the rule." Cotto v. United States, 993 F.2d 274, 278 (1st Cir. 1993). "[A]

motion thereunder is only appropriate when none of the first five subsections pertain. . .

. Clause (6) may not be used as a vehicle for circumventing clauses (1) through (5)." Id. at

277. *See also* Lafata, 344 B.R. at 726.

B. Preliminary Considerations

_____Two considerations frame the Court's analysis.  The first is that the Liquidating

Trustee is precluded as a matter of law from seeking an order vacating confirmation of the

2004 Debtors' Third Amended Plan of Reorganization. *See* 11 U.S.C. § 1144. Although his

allegations primarily pertain to ill-conceived financial projections and inadequate exit

financing that he contends tainted the confirmation process, leading to confirmation of a

plan that was followed by the need for further financial reorganization of the 2004 Debtors'

successors - - the Reorganized Debtors - - he is not asking, and, indeed, cannot ask the

23

Court to vacate the July 21, 2004 order of confirmation.  Thus, the question becomes whether the same alleged misconduct, i.e., nondisclosure of faulty projections and inadequate exit financing, which gave rise to the procurement of a confirmation order, with its attendant findings under 11 U.S.C. § 1129(a)(11),[3] can serve as grounds for vacating the award of compensation to the 2004 Professionals.

The second consideration affecting resolution of the Motion to Vacate and a corollary to the first, requires this Court to trace the lineage of the claims asserted by the Liquidating Trustee, an exercise employed by the United States Court of Appeals for the First Circuit in Nisselson v. Lernout, 469 F.3d 143 (1st Cir. 2006), a case in which the court considered the affirmative defense of *in pari delicto* in litigation involving "a corporate shark," which used fraudulent means to induce an allegedly innocent target corporation to enter into a merger agreement.  469 F.3d at 147.  The First Circuit posed the question: "Who, exactly, are the proper parties for the purpose of determining relative blame?"  Id. at 152.  It noted that "genealogy is important," adding "[g]iving effect to it, the trustee may assert only those claims that [the debtor] could have asserted prior to seeking the protection of the bankruptcy court."  Id. at 153 (citing Mediators, Inc. v. Manney (In re Mediators, Inc.), 105 F.3d 822, 826 (2d Cir. 1997)).  The court reasoned that "a trustee in bankruptcy cannot and does not acquire rights or interests superior to, or greater than,

_____

[3] Section 1129(a)(11) contains the confirmation requirement that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  11 U.S.C. § 1129(a)(11).

those possessed by the debtor." Id.

Given the First Circuit's emphasis on genealogy, this Court must answer the same question posed in Lernout by first determining whose rights the Liquidating Trustee is asserting. The only possible answer is that he is asserting the rights of the 2004 Reorganized Debtors. Thus, as the First Circuit recognized in Lernout, the *in pari delicto* defense must be available to a defendant in an action by a bankruptcy trustee whenever the defense would have been available in an action by the debtor. Id. According to the First Circuit, "[t]here is no 'innocent successor' exception available to a bankruptcy trustee in a case in which the defendant successfully could have mounted an in pari delicto defense against the debtor." Id. (citing Official Committee of Unsecured Creditors v. R. F. Lafferty & Co., 267 F.3d 340, 356-57 (3d Cir. 2001)). Thus, this Court must resolve the question of whether the Reorganized Debtors could obtain the relief the Liquidating Trustee now seeks. The answer to the question is no.

C. Newly Discovered Evidence

At the time the 2004 Professionals filed their fee applications and the Court entered the orders awarding them compensation, the 2004 Reorganized Debtors were in control of business operations, having engaged a new group of legal and financial advisors.[4] The engagement of the 2004 Professionals pursuant to orders entered by this Court had ceased,

_____

[4] Jefferies, which had formerly been retained by the Official Committee of Unsecured Creditors, was employed by the Reorganized Debtors. The Court, of course, recognizes that the majority owners of the common stock of the Reorganized Debtors were unsecured creditors (Senior Note Holders) of the Debtors whom Jefferies assisted through August 10, 2004.

and the Debtors were operating with oversight from their newly constituted Board of Directors, four of whose five members were designated by the Equity Security Holders.

Accepting the Liquidating Trustee's representations as true, namely that the 2004 Professionals knew or should have known that the projections used to obtain confirmation were unreliable and that the exit financing was inadequate, the Reorganized Debtors, the successors to the 2004 Debtors, had to have had the same knowledge as the Debtors who were the source of the projections.  Yet, neither the 2004 Reorganized Debtors nor the former Senior Noteholders/equity interest holders, directly or through their counsel, objected to the fee applications submitted by the 2004 Professionals, thus permitting this Court to find that the 2004 Professionals were entitled to the compensation they requested in view of the factors set forth at 11 U.S.C. § 330(a)(3).  Indeed, in view of the speed with which the 2004 Debtors obtained confirmation of the Third Amended Plan and the payment of on hundred percent of unsecured claims, the Court had no reason to suspect that the finding it made under 11 U.S.C. § 1129(a)(11) was wrong.  Absent objections to the fees, the Court examined the fee applications in camera and awarded the fees to the 2004 Professionals as requested.

In short, for purposes of the Motion to Vacate, the Court accepts the compelling arguments made by the 2004 Professionals that the Liquidating Trustee, standing in the shoes of the 2004 Reorganized Debtors, submitted no new evidence or demonstrated that "new evidence" could not have been discovered before November 9, 2004.  The Reorganized Debtors obtained exit financing on August 10, 2004. The Court did not act on

26

the fee applications of the 2004 Professionals until three months later, at which time the

financial condition of the Reorganized Debtors was dire. The Reorganized Debtors, the

group of Senior Noteholders providing the exit financing and the equity interest holders

of the common stock who controlled the new Board of Directors had to have been aware

of this situation but chose not to act. Under these circumstances, the Liquidating Trustee

whose claims derive from the Reorganized Debtors, has failed to demonstrate the existence

of new evidence. While the evidence may have been new to him personally, it cannot be

said to be new to the Reorganized Debtors in whose shoes he stands.

    D. <u>Fraud, Misrepresentation or Other Misconduct</u>

    At no time, in his pleadings or briefs, did the Liquidating Trustee, allege fraud on

the court or fraud by each of the 2004 Professionals with particularity. *See generally* Fed.

Bankr. P. 7009 and Fed. R. Civ. P. 9(b). *Cf.* <u>Pearson v. First NH Mortgage Corp.</u>, 200 F.3d

30 (1st Cir. 1999); <u>Salsberg v. Trico Marine Servs., Inc. (In re Trico Marine Servs., Inc.)</u>, 337

B.R. 811 (Bankr. S.D.N.Y. 2006), *ratified,* 343 B.R. 68 (Bankr. S.D.N.Y. 2006). . Assuming

without deciding that the Liquidating Trustee has stated sufficient grounds to implicate

Rule 60(b)(3) with respect to fraud, misrepresentation or other misconduct, however, the

Court concludes that the defense of *in pari delicto* precludes the entry of an order vacating

the November 9, 2004 orders. The Court finds that the doctrine is applicable both as an

affirmative defense and as an equitable one. *See* <u>Lernout</u>, 469 F.3d at 151 ("In pari delicto

is both an affirmative defense and an equitable defense. Broadly speaking, the defense

prohibits plaintiffs from recovering damages resulting from their own wrongdoing."). The

First Circuit in <u>Lernout</u> described a "binary paradigm" for application of the *in pari delicto*

defense,[5] restricting its application to situations "in which (i) the plaintiff, as compared to

the defendant, bears at least substantially equal responsibility for the wrong he seeks to

redress and (ii) preclusion of the suit would not interfere with the purposes of the

underlying law or otherwise contravene the public interest." <u>Id.</u> at 152.

In this case, the Liquidating Trustee, whose claims derive from those of the

---

[5] The First Circuit summarized the doctrine, noting that it is grounded on twin premises. 469 F.3d at 151.  It stated:

> The first is that "courts should not lend their good offices to mediating disputes among wrongdoers." <u>Bateman Eichler, Hill Richards, Inc. v. Berner</u>, 472 U.S. 299, 306, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985). The second is that "denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." <u>Id.</u>
>  The in pari delicto defense has long been woven into the fabric of federal law. *See* <u>id.</u> at 307, 105 S.Ct. 2622 (discussing the doctrine's historical development); *see also* <u>Fleming v. Lind-Waldock & Co.</u>, 922 F.2d 20, 28 (1st Cir.1990); <u>Duncan v. Me. Cent. R. Co.</u>, 113 F. 508, 509 (C. C. D.Me. 1902). It does not make a difference that some of the trustee's claims are premised on state law. Those claims invoke the law of Massachusetts--and the Massachusetts courts, like the federal courts, have warmly embraced the in pari delicto defense. *See, e.g.,* <u>Council v. Cohen</u>, 303 Mass. 348, 21 N.E.2d 967, 970 (1939); <u>Choquette v. Isacoff</u>, 65 Mass.App.Ct. 1, 836 N.E.2d 329, 332 (2005).
>  As originally conceived, the in pari delicto doctrine forged a defense of limited utility. Over time, however, courts expanded the doctrine's sweep, deploying it as a basis for dismissing suits whenever a plaintiff had played any role--no matter how modest--in the harm-producing activity. *See* <u>Bateman Eichler</u>, 472 U.S. at 307, 105 S.Ct. 2622. Deploring this overly commodious construction, the Supreme Court later reined in the doctrine and returned it to its classic contours. *See* <u>Pinter v. Dahl</u>, 486 U.S. 622, 635, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988); <u>Bateman Eichler</u>, 472 U.S. at 310-11, 105 S.Ct. 2622. . . .

<u>Id.</u> at 151-52.

Reorganized Debtors, bears equal responsibility, by operation of law, for the wrong he now

seeks to address.  The Debtors and the Reorganized Debtors prepared, with the assistance

of Evercore and Jefferies, the financial projections which the Liquidating Trustee maintains

precipitated confirmation of plan that was not feasible.  Additionally, the Reorganized

Debtors, with knowledge of the inadequacy of the exit financing and their deteriorating

financial conditions, elected to withhold that information from the Court by failing to

object to the fees of the professionals that the Debtors employed.  Now, the Liquidating

Trustee, as their successor, cannot obtain an order vacating the fee awards.  Not only

would such an order contravene the *in pari delicto* doctrine, but the principle of *res judicata*,

as well.  *See* In re Iannochino, 242 F.3d 35 (1st Cir. 2001).

     With respect to the second part of the paradigm referenced by the court in Lernout,

namely that preclusion of the suit will not interfere with the purpose of the underlying law

or otherwise contravene the public interest, the Court finds that application of the defense

will serve, rather than thwart, both the underlying law and the public interest.  In the first

place, application of the doctrine is consistent with principles of res judicata, discussed

below, as well as with the release and exculpation provisions of the Third Amended Plan

and the order of confirmation.  In the second place, it is consistent with the realities of these

consecutive Chapter 11 cases.  As noted by Jefferies, the general unsecured creditors have

"received an outstanding return."  Trade creditors were paid in the prior cases in full and

in the present cases in full with interest. The Senior Noteholders in the 2004 cases received

equity in the Reorganized Debtors valued at approximately 52% of the face amount of the

Senior Notes.    According to Jefferies, "[a]fter two bankruptcy cases in one year, the upheaval of a Chapter 11 trustee's appointment, and the fundamental business changes that the Chapter 11 trustee implemented, the Debtors were *still* solvent more than $100 million."    Where certain Senior Noteholders provided debtor-in-possession and exit financing, and where the Senior Noteholders traded debt for equity and had significant control over the operation of the Debtors, coupled with the reality that the Motion to Vacate is being prosecuted for their benefit, equity is not served by excusing their participation in any concealment of the inadequacies of the projections and sufficiency of the equity financing.

E. Res Judicata, Collateral Estoppel and Other Defenses

The First Circuit's decision in In re Iannochino, 242 F.3d 35 (1st Cir. 2001), is instructive, and its holding is applicable to the Motion to Vacate.    In that case, former Chapter 7 debtors sued their bankruptcy counsel in Massachusetts state court for professional malpractice in conjunction with services performed during the bankruptcy case.    Although the debtors had objected to the fee application, they failed to attend the hearing scheduled by the bankruptcy court, and the bankruptcy court allowed, in part, counsel's fees for services rendered during the debtors' Chapter 13 case prior to its conversion to Chapter 7.    Upon removal of the state court malpractice action to the bankruptcy court, the bankruptcy court held that the debtors' claims were barred by the res judicata effect of the order approving the fee application entered several years earlier. The district court affirmed.    242 F.3d at 40-41.

30

In affirming the district court, the First Circuit discussed the specific requirements

for giving res judicata effect to an order entered by the bankruptcy court, namely that

"there must be '(1) a final judgment on the merits in an earlier suit, (2) sufficient identicality

between the causes of action asserted in the earlier and later suits, and (3) sufficient

identicality between the parties in the two suits.'" 242 F.3d at 43 (citing Mass. Sch. of Law

v. American Bar Assoc., 142 F.3d 26, 37 (1st Cir.1998))(footnote omitted).  With respect to

the last requirement, this Court has concluded that there is identicality between the

Reorganized Debtors and the Liquidating Trustee.  Moreover, the fee awards constituted

a final judgment on the merits as the orders determined all the compensation owed to the

2004 Professionals.  See 242 F.3d at 44.

With respect to the identity of the causes of action, the First Circuit explained:

> In determining whether "causes of action are sufficiently related to support
> a res judicata defense," we have "adopted a transactional approach." Mass.
> Sch. of Law, Inc. v. American Bar Assoc., 142 F.3d 26, 38 (1st Cir. 1998). We
> have relied upon the three factors set forth in the Restatement to guide our
> analysis of whether two claims are actually part of a single cause of action.
> See Porn v. Nat'l Grange Mut. Ins. Co., 93 F.3d 31, 34 (1st Cir. 1996). Though
> none of these factors is determinative, and the three factors do not exhaust
> all factors that may be considered, they provide a helpful framework for
> analyzing the Iannochinos' contentions. See id. First, we look to "whether the
> facts are related in time, space, origin or motivation," second, to "whether
> they form a convenient trial unit," and third, to "whether their treatment as
> a unit conforms to the parties' expectations." Id. (quoting Restatement
> (Second) of Judgments § 24 (1982)).

Relying upon  In re Intelogic Trace, Inc., 200 F.3d 382, 387 (5th Cir. 2000), the First

Circuit observed that the malpractice claim entailed the same concerns as those set forth

in 11 U.S.C. § 330(a)(3)(A), namely "the nature, the extent, and the value of such services."

31

It added that two claims would form a convenient trial unit as the witnesses or proofs to prove establish both claims would overlap, and that the parties expectations would not require a different result as the debtors knew all the facts necessary to bring the malpractice action at the time of the fee application. Id. at 49.

With respect to the Motion to Vacate, at bottom it is a challenge to the confirmation order. As noted above, the confirmation order stands and cannot now be modified or vacated. The Liquidating Trustee, attempts to circumvent the issues decided by that order and its finality by challenging the fee awards. Principles of res judicata and collateral estoppel precluded that result.

The Court finds that the release and exculpation provisions set forth in the confirmed Plan bind the Reorganized Debtors and the Liquidating Trustee who stands in their shoes. Allowance of the Liquidating Trustee's Rule 60(b) motion would, as argued by the 2004 Professionals, also constitute an "end run" around the requirements for revocation of confirmation set forth in 11 U.S.C. § 1144. *See* Monarch Life Ins. Co. v. Ropes & Gray, 65 F.3d 973, 983-84 (1st Cir. 1995).

The order of confirmation provided the context for the fee awards. If the Court's findings made in aid of confirmation are immune from challenge, the release and exculpation provisions must remain in effect. In other words, this Court cannot use hindsight to extinguish the effect of those releases based upon the theory that the Liquidating Trustee, as the successor to the 2004 Reorganized Debtors, can assert greater rights that the Reorganized Debtors under Rule 60(b).

32

**V. CONCLUSION**

For the reason set forth above, as well as for reasons set forth in the Oppositions of the 2004 Professionals incorporated by reference, the Court shall enter an order denying the Motion to Vacate.  The Court concludes that the defenses analyzed herein compel disallowance of the Motion to Vacate and a discussion of the other defenses raised by the 2004 Professionals is unnecessary and would serve no useful purpose.

By the Court,

Joan N. Feeney

_____
Joan N. Feeney
United States Bankruptcy Judge

Dated: January 19, 2007

33