# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**HIGH VOLTAGE ENGINEERING**                    Chapter 11
**CORPORATION,** *et al.,*                       Case No. 05-10787-JNF
　　　　Debtors                                  (Substantively Consolidated)

~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matters before the Court are 1) the "Motion of the Liquidating Supervisor for Order (A) Authorizing the Abandonment to the New Jersey Department of Environmental Protection of the Debtors' Contingent Interest in Certain Funds Held in Trust and (B) Relieving the Liquidating Supervisor from any Further Obligations with Respect to Certain Real Property Located in New Jersey" (the "Abandonment Motion"); 2) the "Motion of the Liquidating Supervisor for Authority to Cause Debtors to Enter into Settlement Agreement with Raymond Mellen, Jeanne Mellen and the State of New Jersey" (the "Settlement Motion"); and 3) the "Opposition on Behalf of Mellen Pride Sales Company, Inc. to (1) the Motion of the Liquidating Supervisor for Authority to Cause Debtors to Enter into Settlement Agreement with Raymond Mellen, Jeanne Mellen and the State of New Jersey and (2) the Assented to Motion of Raymond Mellen and Jeanne Mellen for Redaction of

1

Information Relating to Their Settlement Agreement."[1]  The Court heard the Settlement Motion on September 10, 2008, at which time the Liquidating Supervisor requested allowance of the Abandonment Motion.

At the hearing, which was not attended by counsel to the State of New Jersey, Department of Environmental Protection ("NJDEP"), none of the parties in attendance requested an evidentiary hearing.  Because the material facts necessary to determine the outcome of this contested matter are not in dispute, and relevant documents were attached to the various pleadings submitted by the parties without opposition, including Responses to the Abandonment Motion filed by the NJDEP and Raymond and  Jeanne Mellen (collectively, the "Mellens"), the Court shall treat the Abandonment Motion and the Settlement Motion as motions for summary judgment and the Opposition filed by  Mellen Pride Sales Company, Inc. ("Mellen Pride") to the Settlement Motion as a cross-motion for summary  judgment. *See* Fed. R. Bankr. P. 9014(c).

The issues presented by the Abandonment Motion and Settlement Motion are complex and involve the environmental contamination and on-going cleanup of property located at 211 Randolph Avenue in the Avenel section of Woodbridge, New Jersey (the "Property" or the "the New Jersey Site").  The New Jersey Site was formerly owned by a subsidiary of  High Voltage Engineering Corporation ("HVE").  The Mellens acquired the Property in 1978, and Mellen Pride purchased the Property from the Mellens in 1989.  The

---

[1] Raymond and Jeanne Mellen withdrew the Assented to Motion by Raymond and Jeanne Mellen for Redaction of Information Relating To Settlement Agreements. Accordingly, the Opposition is moot with respect to request for redaction.

Property is the subject of an Administrative Consent Order (the "ACO") issued by the

NJDEP. Remediation has taken place at the New Jersey Site since 1989. An understanding

of the ACO and the concomitant Settlement Agreement among HVE, the Mellens, and

Mellen Pride is critical to resolution of the issues before the Court. Those issues include

whether the Liquidating Supervisor may properly abandon the Debtors' contingent

interests in funds held in a Remediation Trust to the Trust beneficiary, namely the State

of New Jersey; whether the Liquidating Supervisor satisfied his burden with respect to his

proposed settlements with the State of New Jersey and the Mellens; and whether Mellen

Pride has standing to object to the Liquidating Supervisor's Settlement Motion.

The Court now makes findings of fact and rulings of law in accordance with Fed.

R. Bankr. P. 7052.

## II. FACTS

A. Procedural Background

As noted above, all pertinent facts are contained in the Abandonment Motion, as

well as other pleadings filed with the Court by the Liquidating Supervisor, the Mellens,

and Mellen Pride. HVE and certain of its subsidiaries, including Robicon Corporation,

Ansaldo Ross Hill, Inc., Hivec Holdings, Inc., HVE Acquisition Corporation, and Nicole

Corporation (collectively, the "Debtors"), filed Chapter 11 petitions on February 8, 2005,

their second in less than a year.[2] From the date of the filing until February 16, 2005, the

---

[2] The Debtors, together with certain affiliates, previously filed for protection
under Chapter 11 on March 1, 2004. The plan of reorganization in the Debtors' first
Chapter 11 case was confirmed on July 21, 2004 and became effective on August 10,

Debtors remained in possession of their businesses and managed and operated them as debtors-in-possession. On February 16, 2005, this Court *sua sponte* appointed a Chapter 11 trustee. The next day, Stephen Gray was appointed Chapter 11 Trustee. He continued in that role until his appointment as Liquidating Supervisor on the effective date of the confirmed First Amended Plain of Liquidation filed by the Chapter 11 Trustees.[3]

To resolve the myriad issues before the Court, it is crucial to know whether the Mellens, Mellen Pride and the NJDEP had appropriate notice of applicable bar dates for filing claims, as well as sufficient notice of, and an opportunity to object to, the Chapter 11 Trustee's Disclosure Statement and Plan of Liquidation.

On April 8, 2005, the Chapter 11 Trustee filed a "Motion of Chapter 11 Trustee for Order Establishing Bar Dates for Filing Proofs of Claim and Authorizing Procedures for

---

2004, approximately six months before the Debtors filed their second Chapter 11 cases.

[3] The First Amended Disclosure Statement revealed that the Chapter 11 Trustee had sold the Debtors' businesses and liquidated substantially all their assets, resulting in sufficient proceeds to satisfy all Allowed Claims and to provide a distribution to Equity Holders. The Chapter 11 Trustee disclosed that on the Effective Date, he would transfer all of the Debtors' Causes of Action, as defined in the Disclosure Statement, to the Liquidating Trust and the Beneficiaries of the Liquidating Trust would be deemed to have transferred all of their claims to the Liquidating Trust. The First Amended Disclosure Statement further provided:

> On or after the Effective Date, the Liquidating Supervisor will (a) transfer all of the Debtors' remaining assets, whether liquidated or unliquidated to the Liquidating Trust, and (b) cause each of the Debtors to be dissolved. At such time, the Liquidating Trustee will be responsible for, among other things, making distributions to holders of as-yet satisfied Allowed Claims, if any, in accordance with the Plan, investigating and potentially pursuing Causes of Action, objecting to Disputed Claims asserted against the Debtors, and winding up the Liquidating Trust.

Providing Notice Thereof," through which he sought bar dates for the filing of prepetition

claims and claims of governmental units holding claims that arose before the petition date.

A few days later, on April 14, 2005, this Court granted the Trustee's Motion and entered

an order establishing May 31, 2005 as the bar date for filing non-governmental claims, other

than those of the Debtors' subsidiaries and affiliates (the "General Bar Date"), and August

18, 2005 as the bar date for filing claims of governmental units (the "Government Bar

Date"). Previously, on April 11, 2005, the Court had granted the Chapter 11 Trustee's

Motion for Order (I) Appointing the Trumbull Group, LLC as Claims, Noticing, Balloting

and Disbursing Agent, (II) Authorizing the Adjudication and Resolution of Remaining

Claims from Debtors' First Chapter 11 Case, and (III) Relieving Donlin, Recano &

Company, Inc. of its Responsibilities in the Debtors' First Chapter 11 Case, and (IV)

Authorizing the Trumbull Group, LLC to Maintain the Claims Register From Debtors' First

Chapter 11 Case."

On April 21, 2005, Trumbull Group, LLC ("Trumbull") served notice of the General

Bar Date and the Government Bar Date upon the NJDEP, Mellen Chemicals, Inc. and

"Pride Solvent & Chemical Company of New" [sic]. Trumbull served Mellen Chemicals,

Inc. and Pride Solvent & Chemical Company at the same address, namely 211 Randolph

Avenue, Avenel, NJ 07001-0000. *See* Affidavit of the Trumbull Group, L.C. Regarding

Service of the Notice of Bar Dates for Filing Proofs of Claim and Proof of Claim Form

(#465). Trumbull also caused notice of the General Bar Date to be published in the national

edition of the *Wall Street Journal*, as well as the *Pittsburgh Post-Gazette* and the *Boston Globe.*

The Notice served by Trumbull provided in pertinent part the following:

> ANY HOLDER OF A CLAIM THAT IS NOT EXCEPTED FROM THE REQUIREMENTS OF THIS NOTICE, AS SET FORTH IN SECTION 4 ABOVE [CAPTIONED "WHO NEED NOT FILE A PROOF OF CLAIM"], AND THAT FAILS TO FILE A TIMELY PROOF OF CLAIM IN THE APPROPRIATE FORM AND AGAINST THE CORRECT DEBTOR WILL BE FOREVER BARRED FROM ASSERTING SUCH CLAIM AGAINST THE DEBTORS AND THEIR CHAPTER 11 ESTATES, FROM VOTING ON ANY PLAN OF REORGANIZATION FILED IN THESE CASES, AND FROM PARTICIPATING IN ANY DISTRIBUTION IN THE DEBTORS' CASES ON ACCOUNT OF SUCH CLAIM.

According to representations made by Ronda K. Collum, a Trumbull Vice President, in an Affidavit filed in conjunction with the contested matters now before the Court, counsel to the Chapter 11 Trustee advised her on May 4, 2005 to add the Mellens, and Mellen Chemicals, Inc. to the list of possible creditors with an address of 7 Breeze Knoll Drive, Westfield, N.J. 07090, and to also add their counsel, the law firm of Riker, Danzig, Scherer & Hyland ("Riker Danzig") located in Morristown, NJ to the list. According to Ms. Collum, she caused notice of the General Bar Date to be sent to the Mellens and the firm of Riker Danzig on May 5, 2005. In her Affidavit, she stated that notices mailed to the Mellens in August and September of 2005 were returned as undeliverable. Notices mailed to Riker Danzig, however, were not returned.

On October 3, 2005, the Chapter 11 Trustee filed a "Motion of Chapter 11 Trustee for Order Establishing Bar Date for Filing Requests for Payment of Certain Administrative Claims and Authorizing Procedures for Providing Notice Thereof," through which he sought the establishment of November 30, 2005 as a bar date for filing administrative claims (the "Administrative Bar Date"), other than those of court-appointed professionals retained in the Debtors' cases. On October 14, 2005, Trumbull served notice of the

6

Administrative Bar Date on Mellen Chemicals, Inc. at the Avenel, NJ address, as well as on

Riker Danzig.  It also served Mellen Pride Sales Company "c/o Speno, Goldman, Goldberg,

Corcoran & Ste [sic] Attn: Jack Steingart, Esq. at 300 Old Country Road #241, Mineola, NY

11501-4416" (#1328).  In addition, Trumbull served notice of the Administrative Bar Date

on "Pride Solvents & Chemical Co. of NY, Inc. Arthur W. Dhom, Jr. [sic]" at 6 Long Island

Avenue, Holtsville, NY 11742, as well as at 211 Randolph Avenue, Avenel, NJ.

On April 5, 2006, the Chapter 11 Trustee filed Chapter 11 Trustee's Plan of

Liquidation under Chapter 11 of the Bankruptcy Code, together with a Disclosure

Statement and "Trustee's Motion for Order (1) Approving Disclosure Statement; (2)

Approving Proposed Record Date with Respect to Equity Holders, (3) Approving Form of

Ballot, Voting Deadline, and Procedures for Vote Tabulation, (4) Approving Form of

Notice, (5) Scheduling Confirmation Hearing, and (6) Establishing Deadlines Related

Thereto."  On April 11, 2006, Trumbull served notice of the Hearing Date and Objection

Deadline with respect to the Chapter 11 Trustee's Motion seeking approval of the

Disclosure Statement and other relief on Mellen Chemicals, Inc., Mellen Pride Sales

Company, and Pride Solvents & Chemical Company of NY in the same manner and at the

same addresses noted above with respect to the Administrative Bar Date (#1808).  The

Chapter 11 Trustee's Disclosure Statement, as well as his First Amended Disclosure

Statement, contained no explicit references to any environmental contamination in New

Jersey, or to the State of New Jersey, the Mellens, Mellen Chemicals, Inc. or Mellen Pride.

On May 22, 2006, this Court entered an order approving the Debtors' Disclosure

Statement and scheduling a hearing on confirmation.  On May 30, 2008, Trumbull served

a "Notice of (I) Unimpaired Non-Voting Status for Trustee's Chapter 11 Plan of Liquidation

and Disclosure Statement and (II) Hearing to Consider Confirmation of Trustee's Chapter

11 Plan of Liquidation and (III) Certain Deadlines Regarding Voting on the Plan and

Objecting to Confirmation of the Plan" (#1904) on Mellen Chemicals, Inc. at 211 Randolph

Avenue, Avenel, NJ, and on Mellen Pride Sales Company in care of "Speno, Goldman,

Goldberg, Corcoran & Ste [sic] ATTN: Jack Steingart, Esq., at 300 Old Country Road, #241,

Mineola, NY.  The Notice provided that holders of Class I Priority Claims, Class II Secured

Claims and Class 3 Allowed General Unsecured Claims were unimpaired and not entitled

to vote to accept or reject the plan.  The Notice provided, however, that "[i]f,

notwithstanding this notice of your non-voting status, you believe that you may have a

claim against or interest in the Debtors which entitles you to vote on the Plan, you should

immediately request copies of the Plan and the Disclosure Statement."  It also contained

information about the confirmation of, and the permanent injunction provided by, the plan.

Trumbull also caused Notice of (1) Hearing to Consider Confirmation of Chapter 11

Trustee's Plan of Liquidation and (II) Certain Deadlines Regarding Voting on the Plan and

Objecting to Confirmation of the Plan to be published in the *Wall Street Journal*, national

edition (#1918).

On July 10, 2006, the Court confirmed the Chapter 11 Trustee's First Amended Plan

of Liquidation. The Chapter 11 Trustee's First Amended Plan of Liquidation at Section 7.18

provided the following:

8

Any Claim not filed prior to the General Bar Date, the Government Bar Date, . . . the Administrative Expense Bar Date, the Final Administrative Expense Bar Date, or any other order of the Bankruptcy Court establishing the deadline for filing such claim, as applicable, shall be disallowed as untimely pursuant to Rule 3003(c) of the Bankruptcy Rules, and the holder of such Claim shall not be entitled to any distribution from the Post-Confirmation Estate or the Liquidating Trust on account of such Claim.

Mirroring a plan provision, the confirmation order provided:

On the Effective Date, all executory contracts and unexpired leases that exist between any or all of the Debtors and any person shall be deemed rejected as of the confirmation Date, except for any executory contract or unexpired lease (i) which has been assumed or rejected pursuant to an order of the bankruptcy court entered prior to the Confirmation Date, (ii) as to which a motion for approval of the assumption or rejection of such contract or lease has been filed and served prior to the Confirmation Date, or (iii) which appears on Schedule A to the Plan.

On July 14, 2006, Trumbull served "Notice of Confirmation of Chapter 11 Trustee's First Amended Plan of Liquidation under Chapter 11 of the Bankruptcy Code, as Modified," and the Order Confirming the Chapter 11 Trustee First Amended Plan (#2032) on Mellen Chemicals, Inc. and Pride Solvents & Chemical Company of NY at the Avenel, NJ address. The Notice provided: "[C]laims for rejection damages arising from the rejection of an executory contract pursuant to Section 10.1 of the Plan must be delivered to the Trumbull Group LLC (the Claims Agent") on August 19, 2006 at the following addresses . . . ."

Approximately, sixteen months after confirmation of the Chapter 11 Trustee's First Amended Plan of Liquidation, the Liquidating Supervisor filed the Abandonment Motion now before the Court. Counsel to the Liquidating Supervisor served the Abandonment Motion on the Mellens, the NJDEP and Arthur Dhom at "Pride Solvent and Chemicals,"

211 Randolph Avenue, Avenel, NJ. Neither Mellen Pride nor Pride Solvent & Chemical Co.

filed an opposition to the Abandonment Motion, but both the Mellens and the NJDEP did

so. The Mellens captioned their opposition to the Liquidating Supervisor's Abandonment

Motion as a Response and Cross-Motion (I) Objecting to an Order Relieving the

Liquidating Supervisor from Any Further Obligations with Respect to Certain Real

Property in New Jersey and (II) Seeking Leave of Court pursuant to Fed. R. Bankr. P.

3003(c)(3) and/or Fed. R. Bankr. P. 9006(b)(1) to File a Proof of Claim Late (the

"Response"). They asserted that they had not been provided with "actual notice of the

Debtors' bankruptcy nor of any of the important dates established in the case, including

the deadline for filing claims, administrative claim and rejection damage claims and the

approval of the disclosure statement and plan." Specifically, they stated: "The Mellens are

both in their eighties and have resided in an assisting living facility since 2003." They

added:

> [T]he only reason the Mellens became aware of the Motion is because they
> were copied on the New Jersey Department of Environmental Protection
> . . . Notice of Violation to HVE dated November 7, 2007. . . and contacted
> their former counsel, Riker Danzig, which had represented them in the late
> 1980s with respect to the environmental issues at the Property."

The Mellens also attached to their Response the Affidavit of Dennis J. Krumholz, Esq., an

attorney with the firm of Riker Danzig. He averred that the firm represented the Mellens

and Mellen Chemicals, Inc. between 1985 and 1989 with regard to compliance with New

Jersey's Environmental Cleanup Responsibility Act ("ECRA") arising out of their proposed

sale of the Property to Mellen Pride. Attorney Krumholz indicated that the Riker Danzig

firm also represented the Mellens in 1993 in connection with the dissolution of Mellen

Chemicals, Inc. as a corporate entity.  Based upon his review of the firm's records, he stated

that Riker Danzig did not represent the Mellens at any time between 1995 and November

of 2007.  He represented that the attorney who had represented the Mellens, Susan Scott,

Esq., has not been associated with the firm since 1997 when she became a judge of the New

Jersey Superior Court.

B. Environmental Contamination at the New Jersey Site

According to the Liquidating Supervisor, prior to 1978, HVE, or one of its former

subsidiaries, owned the Property.  In or around 1978, HVE, or one of its subsidiaries, sold

the New Jersey Site to the Mellens, who operated a chemical distribution business there.

According to Raymond Mellen ("Mr. Mellen"), he and his wife founded a chemical

distribution company in 1968, which they named Mellen Chemicals, Inc. He represented

that he owned 98% of the stock and served as its president until the company was

dissolved in 1993.  According to Mr. Mellen, in 1978, he and his wife purchased the New

Jersey Site, as individuals, from National Varnish Corporation, a subsidiary of HVE.[4]  Mr.

Mellen stated that, at the time, "there was no indication that contamination was present at

---

[4] In the Settlement Agreement dated August 25, 1989, discussed below, Natvar
Corporation, not National Varnish Corporation, is identified as the HVE subsidiary that
sold the New Jersey Site to the Mellens.  Mellen Pride's environmental consultant stated
that the property was owned by National Varnish Corporation from 1935 to 1973 and
that it was involved in the formulation and application of coating materials to produce
coated fabrics, coated sleaving and extruded tube and film for application in the
pharmaceutical and electronics industries.  He further stated that National Varnish
Corporation was acquired in 1973 by Electronized Chemical Corporation, a subsidiary
of HVE, which was involved in manufacturing similar products.

11

the Property." According to Mellen Pride's environmental consultant, Mellen Chemicals, Inc. bought chemicals in bulk and re-packaged them into drums or smaller containers for distribution to pharmaceutical manufacturers.

Mr. Mellen further represented that in 1985 he and his spouse agreed to sell the New Jersey Site, as well as the business assets and customer list of Mellen Chemicals, Inc. to Mellen Pride, whose principal is Arthur Dhom ("Mr. Dhom"). Mr. Mellen averred that Mr. Dhom kept the name "Mellen" to retain customers of Mellen Chemicals, Inc. Notably, the Liquidating Supervisor represented in the Abandonment Motion that Mellen Pride "now does business as Pride Solvents & Chemical Co."

According to Mr. Mellen, the agreement to sell the New Jersey Site triggered the provisions of ECRA, *see* N.J. Stat. Ann. § 13:1K-9,[5] which required the Mellens, as owners, "to investigate and address any environmental conditions at the site before consummation of the sale." In connection with their responsibilities under ECRA, the Mellens retained Riker Danzig.

In 1987, Riker Danzig on behalf of the Mellens and Mellen Chemicals, Inc., commenced an action against HVE and its officers and directors in the United States District Court for the District of New Jersey in which that alleged that HVE was liable for damages under federal and state laws caused by the release of one or more hazardous chemicals at the New Jersey Site. In 1989, after several years of litigation, the Mellens agreed to a global settlement with HVE, Mellen Pride and the State of New Jersey, which

---

[5] ECRA took effect on December 31, 1983.

was memorialized in two different documents: the ACO, dated July 26, 1989, and a

Settlement Agreement among HVE, the Mellens and Mellen Pride, dated August 26, 1989

(the "1989 Settlement Agreement"). The Liquidating Supervisor represented in the

Abandonment Motion that the Settlement Agreement was rejected pursuant to the First

Amended Plan of Liquidation.[6]

1. The Administrative Consent Order and 1989 Settlement Agreement

The ACO, which is set forth on the letterhead of the NJDEP, contained both

"Findings" and an Order.  Among the Findings were summaries of applicable provisions

of ECRA, which requires an owner or operator of an industrial establishment planning to

sell, close, or transfer operations to notify the NJDEP in writing within five days of the

execution of an agreement or public release of its decision to close; to submit within 60 days

prior to the transfer of title or closing operations, a Negative Declaration or Cleanup Plan

to the NJDEP for approval; and to obtain, upon approval of the Cleanup Plan, a surety

bond or other financial security approved by the NJDEP guaranteeing performance of the

Cleanup Plan in an amount equal to the cost estimate for the approved Cleanup Plan.

---

[6] Section 10.1 of the Chapter 11 Trustee's First Amended Plan of Liquidation
provided for the deemed rejection of all executory contracts and unexpired leases that
existed between the Debtors and "any person," except for 1) any executory contracts or
unexpired leases that had been assumed or rejected prior to the Effective Date, 2) any
executory contract or unexpired lease as to which a motion for approval of the
assumption or rejection of such contract or lease had been filed and served prior to the
Effective Date, or 3) any executory contract or unexpired lease which appeared on
Schedule A to the plan, which was to be assumed or rejected with Court authority after
the Effective Date.  Schedule A was not attached to the plan filed with the Court.  There
were no representations that the 1989 Settlement Agreement appeared on Schedule A.

Additional Findings included both the NJDEP's recognition that, on May 16, 1989, HVE submitted to it an application for an ACO, in which it identified itself, the Mellens and Mellen Chemicals, Inc. as Ordered Parties and referenced the NJDEP's discretion to enter into an ACO so that a closing, termination, or transfer of operations might occur prior to completion of ECRA obligations.

The ACO contained timetables for sampling and the submission of a proposed cleanup plan.  For purposes of this decision, the ACO also required the Ordered Parties to "obtain and provide to NJDEP financial assurance . . . in the amount of $6,000,000.00," as well as a standby trust fund.  According to the ACO, upon approval of the cleanup plan by the NJDP, the Ordered Parties were required to "amend the amount of the financial assurance . . . to equal the estimated cost of implementation of the approved Cleanup Plan."  The ACO permitted the NJDEP to draw on the financial assurance if it determined that the Ordered Parties failed to perform their obligations under the ACO or ECRA in implementing the approved Cleanup Plan.  Furthermore, the ACO provided that the Ordered Parties were to allow NJDEP access to the Property "for the purpose of undertaking all necessary monitoring and environmental cleanup activities," and outlined a range of penalties available to the NJDEP for noncompliance.

In addition, the ACO provided that compliance with its terms would not excuse compliance with "any applicable federal, state or local permits, statutes, regulations and/or orders while carrying out the obligations imposed by ECRA through this ACO."  It also provided the following:

14

No obligations imposed by this ACO . . . are intended to constitute a debt, claim, penalty or other civil action which could be limited or discharged in a bankruptcy proceeding. All obligations imposed by this ACO shall constitute continuing regulatory obligations imposed pursuant to the police power of the State of New Jersey, intended to protect the public health, safety and welfare.

The 1989 Settlement Agreement referenced the ACO issued by the NJDEP. Mellen Pride was a party to the 1989 Settlement Agreement but not the ACO. The 1989 Settlement Agreement provided in pertinent part that the Mellens would execute and file a Stipulation and Order of Dismissal of the litigation pending in the federal district court and that, on the effective date of the ACO, HVE would assume responsibility for "Full Compliance," defined as "conducting all site assessment, sampling, remedial and cleanup activities at the Premises [the New Jersey Site] and all other actions as may be reasonably required by the NJDEP pursuant to ECRA and the ACO until such time as the NJDEP approves in writing a Negative Declaration or the satisfactory completion of an NJDEP-approved Cleanup Plan." Pursuant to the 1989 Settlement Agreement, HVE also would be the so-called "Lead Ordered Party" under the ACO and would post any financial assurance required by the NJDEP in connection with the ACO; that the Mellens or Mellen Chemicals, Inc. also would agree to become "Ordered Parties" under the ACO; that Mellen Pride would purchase from the Mellens and the Mellens would sell to Mellen Pride the New Jersey Site, "subject to the terms and conditions of a contract for sale being executed simultaneously" for $2.1 million; and that Mellon Pride would pay $500,000 of the purchase price to an escrow agent pursuant to the terms of an Environmental Escrow Agreement to be disbursed to HVE.

The 1989 Settlement Agreement, in addition to setting forth payment terms with

15

respect to Mellen Pride's acquisition of the Property and requiring HVE to achieve Full

Compliance with ECRA, provided that HVE would have the "sole and exclusive right to

make submissions to, and to conduct all negotiations with, the NJDEP . . ., including the

sole and exclusive right to formulate, negotiate, and implement all site characterization and

remediation activities required by NJDEP to be undertaken at the Premises pursuant to

ECRA and the ACO."[7]  Until HVE achieved Full Compliance, in addition to making the

Property available for remediation by HVE, Mellen Pride and the so-called Dhom Group,

comprised of Mellen Pride and any corporations or entities related to its business,

"including but not limited to Pride Solvents and Chemical Company, Inc., and any

successors, assigns, heirs, administrators, or executors of any of the foregoing," agreed not

to communicate or negotiate with the NJDEP with respect to ECRA compliance at the

Property without the prior written consent of High Voltage.  The parties agreed, however,

that Mellen Pride and other members of the Dhom Group could respond to

communications from the NJDEP provided that notice was given to HVE in advance of any

_____

[7] It further provided the following:
The precise scope, extent and method of site characterization and cleanup
will be matters to be negotiated between High Voltage and NJDEP and
may include, without limitation, no action, in-situ encapsulation of
hazardous substances or wastes, application of in-situ or ex-situ
remediation technologies to the surface and sub-surface soils of the
Premises, excavation and off-site disposal of such soils, the installation of
monitoring wells or treatment systems for long term monitoring or
treatment of surface or groundwater at the Premises, or the use or
implementation of any other method or combination of methods
developed and proposed by High Voltage to, and approved by, the
NJDEP.

16

response, and they could initiate communications with the NJDEP with respect to "any proposed action that would result in a materially adverse effect (e.g. a destruction of a building) upon the business, financial condition or results of operation of The Dhom Group considered as a whole for the sole purpose of eliminating such action or proposing an alternative thereto," provided that notice be given to HVE. Mellen Pride and the Mellens also agreed to cooperate with HVE, and The Dhom Group agreed to provide HVE and its consultants, contractors and subcontractors, and the NJDEP access to the Property at reasonable times and upon reasonable notice "in a manner sufficient to enable High Voltage to achieve Full Compliance With [sic] ECRA." The Dhom Group promised to execute any documents reasonably requested by HVE, to refrain from leasing or conveying the Property to any third-party unless such third-party agreed in writing to be bound, and it also agreed to "comply with all federal, state and local laws, regulations, ordinances, rules, decrees or orders presently or hereafter in effect, as the same may from time to time be amended, which apply to the Premises and relate to the protection of the environment." It further agreed to assign to HVE all claims and causes of action, known or unknown, against any person, firm, corporation or other entity which was either a prior owner, tenant, operator, or entity or person in any way responsible for the environmental condition of the Property. In addition, the Dhom Group granted a broad release to HVE, as well as its affiliates and officers and directors, of "any and all claims for personal injury, wrongful death, damage to property, monetary loss, loss of profits, loss of use, loss of or interference with economic advantage or prospective economic advantage or any other

17

loss, damage, cost or expense relating to any environmental contamination existing at or

on the Premises, or the ownership, use or occupancy of or operations at the Premises by

any member of the High Voltage Group arising out of the conduct of High Voltage prior

to the execution of this Agreement."

In conjunction with the 1989 Settlement Agreement, HVE agreed to indemnify the

Dhom Group and hold it and Mellen Group harmless "from any losses, fees, costs,

expenses, damages, penalties or liabilities ("Losses") incurred after the date of the Closing

in connection with the achievement of Full Compliance With [sic] ECRA."  Finally, The

Dhom Group agreed to expressly waive "any claim it or any member of The Dhom Group

may have in the future against The High Voltage [sic] or any member of The High Voltage

Group for any damages occurring as the result of the investigation or remedial activities

conducted at the Premises . . . it being understood that the cleanup of the Premises in

accordance with ECRA . . . may not be completed for several years."

3. The Remediation Trust Fund Agreement

In his Abandonment Motion, the Liquidating Supervisor represented that, in July

2006, HVE established a Remediation Trust Fund (the "Remediation Trust), which is

funded with approximately $1.42 million in cash assets.  According to the Liquidating

Supervisor, pursuant to the agreement establishing the Remediation Trust, "the NJDEP,

the Debtors and the Remediation Trustee agreed that the Remediation Trustee would

disburse funds from the Remediation Trust Fund, as directed by the NJDEP, to fund the

clean up or to reimburse the NJDEP for the Debtors' failure to perform its obligations

18

under the Consent Order." The Liquidating Supervisor further represented that the

Debtors have a contingent reversionary interest in the funds held in the Remediation Trust.

The Chapter 11 Trustee executed the Remediation Trust Agreement on behalf of HVE as

Grantor.

The Remediation Trust Fund Agreement is dated July 11, 2006, one day after the

entry of the confirmation order.[8]  Under the Remediation Trust Fund Agreement, HVE is

designated the Grantor and Citizens Bank of Massachusetts is denominated the Trustee.

Pursuant to Section 4 of the Remediation Trust Fund Agreement, the Trustee was required

to "make payment from the Fund as the Department shall direct, in writing, to provide for

the payment of the costs of remediation of the Site(s)."  Pursuant to Section 5, upon the

Trustee's receipt from the Department of a written determination that HVE has failed to

perform the remediation of the Site, the Trustee was required to disburse the monies from

the Fund as directed by the Department in writing to the Department or another person

designated by the Department in accordance with NJAC 7:26C-7.12(c) and (d)."  The

Remediation Trust Fund Agreement provided that it was irrevocable and would continue

until terminated by the Grantor, the Trustee, and NJDEP.

According to the Liquidating Supervisor, the NJDEP asserted that the funds in the

Remediation Trust were not property of the Debtors' bankruptcy estates and could not be

returned.  He added that the NJDEP "did not assert any claim or cause of action against

---

[8] The Chapter 11 Trustee executed the Remediation Trust Fund Agreement on
June 30, 2006; Citizens Bank of Massachusetts, through a Vice-President, executed it on
July 11, 2006.

the Debtors' bankruptcy estates."

  4. The Opinions of Environmental Consultants retained by the Mellens and Mellen Pride

  Riker Danzig, on behalf of the Mellens, retained Richard Kapuscinski, Ph.D. ("Kapuscinski"), a Senior Manager at ENVIRON International Corporation, an environmental consulting firm with offices in 22 states and 13 countries in Europe and Asia.  According to Kapuscinski, the New Jersey Site is contaminated with mineral spirits, most notably Xylenes, Toluene and Ethylbenzene, and to a lesser extent chlorinated solvents, including Tetrachloroethylene, Trichloroethylene and 1,1,1-Trichloroethane.  The contamination, which Kapuscinski stated "presents an ongoing and continuing hazard to human health and the environment," is present in four forms: 1) as undissolved liquid known as "free product;" 2) dissolved in the ground water; 3) in a gaseous state; and 4) as adsorbed in soil particles.   According to Kapuscinski, the most imminent hazards are the contaminated groundwater, which could migrate off-site, and soil gas vapor which might migrate into one or more of the buildings on the Property.

  Kapuscinski reviewed some, but not all, of the records maintained by the NJDEP "relating to remediation and the trust fund maintained as financial assurance by the agency to guarantee funding for the Remediation to applicable cleanup standards established and overseen by the NJDEP. . . ."  He stated that HVE proposed a remedial action workplan ("RAW") in 1990, which was approved by the NJDEP.  He represented that HVE conducted remediation at the New Jersey Site from 1997 through 2006 through 1) the removal of free product through active and passive recovery systems ("Free Product Removal System");

2) use of a system to pump groundwater to the surface to remove dissolved contaminants

followed by injection of the treated water back into ground (a "Pump-and-Treat System");

and 3) semiannual ground water monitoring ("Sampling").  According to Kapuscinski,

HVE "appears to have terminated operation of the Free Product Removal and Pump-and-

Treat Systems, although it continued Sampling through February, 2007."  Kapuscinski

stated that HVE was required to fund a $6 million trust fund to guarantee that funds would

be available to finance remediation.  HVE, however, successfully petitioned the NJDEP in

1990, 1992, and 1997 to reduce the Trust Fund from its initial $6 million to $1.42 million.

He concluded:

> It is my opinion that the $1.42 million Trust Fund was not adequate when it
> was established in 1997 to finance the Remediation because it was not
> possible to complete the Remediation pursuant to the RAW within the
> assumed time periods.  The Free Product Removal and Pump-and-Treat
> Systems and Sampling were, in fact, operated for nearly ten years, from 1997
> through 2006.  Yet, clearly HVE was not able to complete the Remediation
> during this period.  In fact, after nearly ten years of operation, little progress
> has been made toward abating the contamination at the Property as
> demonstrated by the most recent Sampling results, which were reported in
> June 2007, and showed extremely elevated levels of contamination.

Kapuscinski also concluded that the cost of completing the remediation will greatly exceed

the financial assurance of $1.42 million, plus interest, because the cleanup plan and

financial assurance were based upon outdated information.  He focused on contamination

of the ground water by free product and ineffective remediation efforts due to problems

with the reinjection of groundwater caused by low soil permeability, a circumstance not

adequately addressed by the RAW.

Steven Caretsky, a Vice President of LFR Inc. ("LFR"), an environmental consulting

21

firm employed by Mellen Pride agreed with Kapuscinski's conclusions. He indicated that

he and other LFR employees visited the New Jersey Site and reviewed Site-related

environmental documents. Like Kapuscinski, he noted that "the treatment system has not

been able to operate as designed due to difficulty in discharging the treated effluent." He

stated:

> [T]he groundwater pump and treat system has operated at the Site for more
> than 10 years and free-phase mineral spirits as well as elevated levels of
> dissolved-phase mineral spirits and chlorinated organic compound remain
> at the Site. Furthermore, there appears to be a source of chlorinated organic
> compounds on the Western Portion of the Site that has not been identified
> and may be acting as a continuing source of groundwater contamination.
> Based on the groundwater elevations and sampling data, there is a
> significant potential that the groundwater contamination identified in the
> Courtyard Area has migrated beneath the building and is impacting the
> Eastern Loading Dock Area. Furthermore, there may be a source of mineral
> spirits contamination beneath the building that has not yet been identified.

Caretsky estimated that it would take an additional ten years and $4,432,500 to cleanup the

Site.

### 4. Recent Developments at the New Jersey Site

On November 2, 2007, approximately seventeen and a half years after entry of the

ACO, the NJDEP, by certified mail, return receipt requested, sent a "Notice of Violation"

to the former president of HVE, Russell L. Shade. In the Notice, the NJDEP referenced a

letter it sent HVE, dated June 30, 2005, in which it required further source investigation due

to the extremely elevated and increasing levels of volatile organic compounds present on

the site, especially in the western portion of the site. In its Notice, it also referenced HVE's

reports dated January 18, 2006 (2nd Semi-annual 2005 Ground Water Monitoring Report),

May 4, 2006 (Remedial Action Report), September 19, 2006 (1st Semi-annual 2006 Ground

Water Monitoring Report), January 22, 2007 (2nd Semi-annual 2006 Ground Water

Monitoring Report), and June 8, 2007 (1st Semi-annual 2007 Ground Water Monitoring

Report).  The NJDEP stated that the reports failed to address NJDEP's requirement of

further source investigation, particularly as the concentration of volatile organic

compounds were at the highest concentrations recorded since November of 1994.  After

outlining six requirements and descriptions of noncompliance, the NJDEP set forth the

corrective action required.  It also stated:

> According to the letter received by the New Jersey's Attorney General's
> Office (dated May 31, 2007) from Lisa Herrington, of Choate Hall & Stewart
> LLP (legal representative for the Liquidating Supervisor for HVECC), Ms.
> Herrington states that "For the reasons set forth below, please be advised
> that HVECC intends to cease, and will instruct CDM to cease, all operations
> on the Property effective September 15, 2007".  This would signify that all
> remediation efforts would cease and HVECC would no longer meet its
> obligations under ISRA and the ACO that was sign6ed in 1989. Ms.
> Herrington's letter further states "the Liquidating Supervisor will agree that
> the Department may retain all amounts held in the Trust Fund in exchange
> for a full release from the Department with respect to the Property".  In a
> June 19, 2007 letter, Ms. Rachel Lehr, Deputy Attorney General, responded
> that the offer in settlement is something that is already required under the
> law pertaining to environmental obligations under ISRA, and the precedents
> concerning remediation trust funds in bankruptcy.
>
> Pursuant to Paragraph 9.D of the ACO dated August 24, 1989 and N.J.A.C.
> 7:26C-7.12, *if the person responsible for conducting the remediation has failed to
> perform the remediation as required, the Department may perform the remediation
> of the site using the funds in the remediation funding source.*  This Notice of
> Violation serves as such notice. If HVECC fails to comply with the
> requirement herein within the designated timeframe, the Department will
> draw down on the remediation funding source.

(emphasis supplied).  The letter was copied to the Mellens, as well as counsel to the

Liquidating Supervisor and "Arthur Dhom, Pride Solvents & Chemicals."

B. The Liquidating Supervisor's Settlement Agreements

_____As noted above, the Mellens and the NJDEP objected to the Liquidating Supervisor's

Abandonment Motion.  The Mellens objected on the ground that they lacked notice of the

applicable bar dates and an opportunity to object to the Chapter 11 Trustee's Plan of

Liquidation, and they sought leave to file a proof of claim.  The NJDEP objected on grounds

that the Remediation Trust Fund established to ensure compliance with the ACO is not

part of the bankruptcy estate, that the monies in the fund rightfully belong to it,  and that

HVE's obligation to cleanup the New Jersey Site is "not a dischargeable debt in bankruptcy,

but an ongoing environmental obligation to remediate."

In response to the objections filed by the Mellens and the NJDEP, the Liquidating

Supervisor  filed an Omnibus Response and Objection to the Objections and Cross-Motion

filed by the State of New Jersey and the Mellens.  The Liquidating Supervisor asserted that

the NJDEP had actual notice of the Bar Dates and confirmation of the First Amended Plan

of Liquidation, but failed to file a proof of claim or "take any steps to protect its rights

against the Debtor or the Post-Confirmation Estate."  The Liquidating Supervisor further

asserted that, because neither the Mellens nor the NJDEP filed proofs of claim on a timely

basis, they have no right to recovery against the Post-Confirmation Estate.  Specifically, he

stated:

> As the Debtors' assets were liquidated and they ceased all business
> operations in 2005, the Debtors were not entitled to any discharge under the
> Bankruptcy Code.  See 11 U.S.C. § 1141(d)(3).  Accordingly, none of the
> Debtors' obligations were discharged.  The fact that the Debtors did not

receive a discharge of their obligations might mean that the NJDEP or the
Mellens could pursue causes of action against HVEC, but it does not give the
NJDEP or the Mellens (or, for that matter, any other entity that failed to file
a timely proof of claim) a right to payment from the Post-Confirmation
Estate.

In addition, the Liquidating Supervisor asserted that the NJDEP's ability to seek monetary

compensation from the Debtors as an alternative to an injunction converted the ACO into

a monetary "claim" against the Debtors' bankruptcy estate.

Five months after filing his Omnibus Response and Objection, the Liquidating

Supervisor proposed a Settlement with the State of New Jersey whereby he, "for himself

and the other HVE  Parties," released and extinguished "all rights, present and future

claims or demands, whether actual or contingent, to the Financial Assurance held in the

Remediation Trust," namely $1.42 million, in exchange for a release from the NJDEP.  That

release pertained to the HVE Parties, defined as the HVE Liquidating Trust, the Debtors,

the HVE Estate, Stephen S. Gray, as the former Chapter 11 Trustee and as the Liquidating

Supervisor, as well as any of their respective parents, subsidiaries, affiliates, agents,

employees, attorneys and representatives, heirs, personal representatives, successors, and

assigns.  The release covered "any and all past, present and future claims, demands, actions

or causes of action of any nature whatsoever, known or unknown, anticipated or

unanticipated which arise directly or indirectly from, or relate to the contamination of the

Property, the Remediation, the [Abandonment] Motion or the ACO (collectively, the

"Released NJDEP Claims")."  Moreover, the State of New Jersey agreed "to refrain from

instituting, pressing or in any way aiding any claims, demands, actions or causes of action

for damages, costs, losses, expenses or compensation in any way related to the Released
NJDEP Claims."

The Liquidating Supervisor also proposed a settlement with the Mellens whereby
the Mellens would have an allowed claim in the amount of $2.25 million without the need
to file a proof of claim, payable in one lump sum installment within ten days following the
entry of a final, non-appealable order approving their Settlement Agreement and the
Settlement Agreement with the NJDEP.  The Liquidating Supervisor also agreed to assign
any insurance policies to the Mellens pursuant to which the Debtors may have been
entitled to coverage for any costs of remediation at the New Jersey Site, and any rights
assigned by the Mellens or Mellen Chemicals, Inc. to HVE under the 1989 Settlement
Agreement, including, but not limited to, claims and causes of action held by the Mellens
against other entities.  In addition, the Liquidating Supervisor released the Mellens from
any and all terms of the 1989 Settlement Agreement that would prevent them from
communicating with the NJDEP or conducting the Remediation.

In exchange the Liquidating Supervisor's release, the Mellens, upon Court approval,
agreed to a broad release of the HVE Parties, as defined above, and agreed to refrain from
instituting, pressing or in any way aiding any claims, demands, actions or causes of action
for damages, costs, losses, expenses or compensation in any way related to the Released
Mellen Claims.

26

C. Mellen Pride's Objection to the Settlement Motion; the Liquidating Supervisor's Reply; and Mellen Pride's Response

Mellen Pride prefaced its Objection with the observation that it purchased the Property in 1989 "based upon the court order and contractual obligations of Debtor High Voltage Engineering Corporation and the Mellens," adding that "[d]uring the subsequent years, HVE failed to remediate the property, while at the same time it successfully convinced the NJDEP to reduce HVE's financial assurance from $6,000,000 to $1,420,000." It noted that it will take ten more years and $4.4 million to cleanup the Property and that, if the Mellens and HVE are allowed to escape their cleanup obligations, "the NJDEP will seek to impose that obligation upon Pride."

Mellen Pride also argued that the proposed settlements do not take into account the public policy of the State of New Jersey to ensure the public health and safety and to cleanup environmental contamination. It emphasized that it purchased the Property for $2.1 million "in reliance upon the ACO and 1989 Settlement Agreement and the obligations of HVE, the Mellens and Mellen Chemicals to complete the cleanup the Property. . ." It complained that it was excluded form the negotiation process that resulted in the Settlement Motion. It further complained that the Liquidating Supervisor failed to provide any analysis of the required factors to be considered for this Court to grant the Settlement Motion, particularly the effect of the Settlement Agreements upon the health of the citizens of New Jersey or Mellen Pride.

Citing In re Healthco Intern'l, Inc., 136 F.3d 45, 50 (1st Cir. 1998), and In re Beaver

27

Street P'ship, 244 B.R. 185 (Bankr. D. Mass. 2000), Mellen Pride emphasized that the

Liquidating Supervisor failed to provide sufficient support fir the Settlement Motion.  It

also asserted that under Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot., 474 U.S. 494, 507

(1986), this Court does not have the power to authorize an abandonment of contaminated

property, or, by extension, an obligation to remediate contaminated property.  It also stated

that the NJDEP Settlement Agreement would not preclude it from commencing a civil

action against HVE for injunctive relief to complete the cleanup and that the NJDEP

Settlement Agreement lacked any actual consideration flowing to the NJDEP in exchange

for its release, particularly as, it asserted, the NJDEP took possession of the $1.42 million

seven months before the terms of the NJDEP Settlement Agreement were reached.

    Finally, Mellen Pride addressed the issue of standing, citing In re Amatex Corp., 755

F.2d 1034, 1042 (3d Cir. 1985).  It stated that as the owner of the Property upon which its

subsidiary continues to operate a chemical repackaging and distribution business, it has

a "sufficient stake in the outcome of the proceeding so as to require representation."

    The Liquidating Supervisor, in his Reply, maintained that Mellen Pride's Objection

was wholly without merit.  In sum, he argued the following:

> Despite having received notice on multiple occasions of the key events in this
> case, including the pleadings resolved by the Settlement Agreements . . .
> Mellen Pride . . . did not file a proof of claim, did not object to the
> Liquidating Supervisor's original motion to cease remediation efforts in New
> Jersey, and did not take any other timely steps to protect its alleged rights.
> Instead, [Mellen] Pride sat on its hands while these cases have progressed
> over the last three and a half years.   Therefore, [Mellen] Pride is not a
> creditor of the Post-Confirmation Estate and does not have standing to object
> to the Settlement Agreements.

Specifically, the Liquidating Supervisor maintained that any claim that Mellen Pride may have held was extinguished as a result of its failure to timely file a proof of claim and that, as a non-creditor of the Post-Confirmation estate, Mellen Pride is not a "party in interest" with standing to object to the Settlement Motion. He added that the potential impact of the allowance of the Settlement Motion on Mellen Pride in the form of responsibility for cleanup costs is not a relevant fact for determining whether the Motion should be granted. According to the Liquidating Supervisor, even if Mellen Pride had standing, its argument that the Post-Confirmation Estate essentially is paying too little to the NJDEP stands the standard for approval of settlements on its head. The Liquidating Supervisor, highlighting the expense associated with resolving the complex issues of law and fact, and the delay in the administration of the Post-Confirmation Estate, submitted that the Settlement Motion should be approved as it satisfies the standard articulated by the court in In re Healthco Int'l Inc., 136 F.3d 45 (1st Cir. 1998), adding that he had consulted with the committee of equity security holders appointed pursuant to the terms of the First Amended Plan of Liquidation, that it had agreed to the terms of the settlement, and that he had more than 30-years of experience working with troubled companies and debtors, having served as a Chapter 11 trustee, receiver, examiner and post-confirmation fiduciary in numerous cases.

In a Response to the Liquidating Trustee's Reply to its Objection to the Settlement Motion, Mellen Pride attempted to explain its inaction: "The NJDEP and the Mellens shared a common interest, i.e., the enforcement of the Debtors' cleanup obligation under the ACO." Because of that shared interest and common goal, Mellen Pride stated that there

was no need to file a third "me too" objection to the Abandonment Motion.  Moreover, it

reiterated its assertion that it was excluded from settlement negotiations by the NJDEP and

the Mellens, as well as its assertion that the Liquidating Supervisor failed to satisfy his

burden that the settlements with the Mellens and the State of New Jersey warrant approval,

again highlighting its public policy argument.

In conjunction with its Response, Jan Alan Brody, an attorney with the firm of

Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, the firm representing Mellen

Pride, submitted an Affidavit, which was attached to Mellen Pride's Opposition to the

Settlement Motion and the Abandonment Motion.  He asserted that the Mellens have

agreed to deposit $1,580,000 [of the $2,250 million settlement amount] with the State of

New Jersey to increase the financial assurance for remediation at the New Jersey Site from

$1,420,000 to a total of $3,000,000, although no written agreement had been executed

between the NJDEP and the Mellens as of July 14, 2008.  Attorney Brody also represented

that the NJDEP had informed him that "the completion of the remediation will be the

responsibility of Pride." Mr. Dhom also asserted in an Affidavit that the NJDEP has taken

the position that if the Liquidating Supervisor and the Mellens fail to complete the cleanup,

Mellen Pride will be responsible for the remaining cleanup.

## III. DISCUSSION

A. <u>Standing</u>

The Court finds that Mellen Pride has standing to object to the Settlement Motion.

As a party to 1989 Settlement Agreement, as the beneficiary of the ACO, as the owner of

the New Jersey Site, and as the party who ultimately may be liable for cleanup costs in

excess of the financial assurance required by the NJDEP from the Ordered Parties, namely

the Mellens and HVE, it has the potential to be a "person aggrieved," if this Court were to

grant the Settlement Motion.  As stated by the court in In re Murphy, 288 B.R. 1 (D. Me.

2002),

> The issue of standing is a "threshold question in every federal case,
> determining the power of the court to entertain the suit." Warth v. Seldin,
> 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). To have standing to
> bring an appeal from a final bankruptcy court order, an appellant must be a
> "person aggrieved." Spenlinhauer v. O'Donnell, 261 F.3d 113, 117 (1st
> Cir.2001). As such, standing exists only where the order "directly and
> adversely affects an appellant's pecuniary interests." Id., at 117-18 (citation
> omitted). A party's pecuniary interests are affected if the order diminishes
> the appealing party's property, increases its burdens, or detrimentally affects
> its rights. Kehoe v. Schindler (In re Kehoe), 221 B.R. 285, 287 (1st Cir. BAP
> 1998).

288 B.R. at 4.  See also In re Amatex Corp., 755 F.2d 1034, 1042 (3d Cir. 1985).[9]  Given the

---

[9] In Amatex Corp., the Third Circuit stated:

Section 1109(b) of the Code, which makes clear that any "party in interest"
may appear and be heard in a chapter 11 case, provides that "[a] party in
interest, including the debtor, the trustee, a creditors' committee, an
equity security holders' committee, a creditor, an equity security holder,
or any indenture trustee, may raise and may appear and be heard on any
issue in a case under this chapter." 11 U.S.C. § 1109(b) (1982). The Code
does not include a definition of party in interest; it is clear, however, that
the term "party in interest" is not limited by the small list of examples in §
1109(b). See 5 Collier on Bankruptcy ¶ 1109.2, at 1109-22 (L. King 15th ed.
1984). Section 102(3) of the Code, 11 U.S.C. § 102(3) (1982), part of the rules
of construction of the Code, states that "including" is not a limiting term.
And courts have not viewed the examples of parties in interest as being
exhaustive. See, e.g., In re Cash Currency Exchange, Inc., 37 B.R. 617, 628 n.
10 (N.D. Ill.1984) (noting that § 1109(b) must be construed liberally); In re
Citizens Loan & Thrift Co., 7 B.R. 88, 89-91 (Bankr. N.D. Iowa 1980).

opinions set forth in the Affidavits filed by Kapuscinski and Caretsky as to the cleanup

costs associated with the presence of mineral spirits and volatile inorganic compounds at

the New Jersey Site, if Mellen Pride were to be required to incur costs in excess of the

settlement amount of $1.42 million payable to the NJDEP from the Remediation Trust plus

the Mellens' purported contribution to the cleanup from their settlement proceeds, its

pecuniary interest would be adversely affected.

The Liquidating Supervisor argued that Mellen Pride lacks standing to object to the

_____

Similarly, one commentator declared that "[s]ection 1109(b) must be
construed broadly to permit parties affected by a chapter 11 proceeding to
appear and be heard." 5 Collier on Bankruptcy ¶ 1109(b), at 1109-22.1 to
1109-23; *see also* Citizens Loan & Thrift Co., 7 B.R. at 90. Consequently,
courts must determine on a case by case basis whether the prospective
party in interest has a sufficient stake in the proceeding so as to require
representation. *See* In re Penn-Dixie Industries, Inc., 9 B.R. 941, 943 n. 7
(Bankr. S.D.N.Y. 1981).


Section 1109(b) continues the pattern of permitting interested parties in
bankruptcy cases the absolute right to be heard and to insure their fair
representation. *See* In re Johns-Manville Corp., 36 B.R. 743, 747 (Bankr.
S.D.N.Y. 1984). Section 206 of the Bankruptcy Act, 11 U.S.C. § 606, and
Chapter X Rule 10-210(a), the predecessor provisions of section 1109(b) of
the Code, constituted an effort to encourage and promote greater
participation in reorganization cases. In In re Keystone Realty Holding
Co., 117 F.2d 1003, 1005 (3d Cir.1941), this Court stated that "[i]n
substituting Chapter X for Section 77B [of the Bankruptcy Act of 1898, 11
U.S.C. § 207], Congress clearly intended to broaden the rights . . . to
participate in corporate reorganization proceedings." *See* In re Duplan
Corp., 450 F.Supp. 790, 791 (S.D.N.Y. 1978). Section 1109(b) continues in
this tradition and should be understood in the same way. *See* Citizens
Loan & Thrift Co., 7 B.R. at 90.

755 F.2d at 1042.

Settlement Motion and the Abandonment Motion because it does not have a claim against the Post-Confirmation Estate, having failed to file a proof of claim.  The Court rejects this argument.  Although Mellen Pride may not have an *allowed* claim for purposes of distribution, it, nonetheless, has a nondischargeable claim against the Debtors' bankruptcy estates.  Although, as a practical matter, that claim may have no value or entitle Mellen Pride to a meaningful monetary or equitable remedy, the Court, nonetheless concludes, from the undisputed facts, that at the commencement of the Debtors' bankruptcy cases Mellen Pride had a contingent, unliquidated claim arising out of the 1989 Settlement Agreement, which was an executory contract imposing on-going and significant duties and obligations on both HVE and Mellen Pride with respect to HVE's efforts to achieve Full Compliance with ECRA.

"'[An executory contract is] a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other.'" Id. at 39 (citations omitted).  Sharon Steel Corp. v. National Fuel Gas Distrib. Corp., 872 F.2d 36, 39 (3d Cir. 1989).  Because HVE had not achieved Full Compliance with the ACO when the Debtors commenced their Chapter 11 cases, its obligations under the 1989 Settlement Agreement were so far unperformed as to give rise to a material breach if it failed to continue its obligations to Mellen Pride under the 1989 Settlement Agreement, which incorporated the ACO.  Similarly, if Mellen Pride failed to honor its obligation to cooperate with HVE to ensure that HVE could meet its responsibilities under the ACO, its

conduct would constitute a material breach. The 1989 Settlement Agreement, in the words

of the Third Circuit, had "reciprocal obligations continuing into the future." Id.

The time for testing whether such reciprocal obligations exist and material

obligations remain unperformed, is at the time the bankruptcy petition is filed. General

DataComm Indus., Inc. v. Arcara ( In re General DataComm Indus., Inc.), 407 F.3d 616, 623

(3d Cir. 2005) (citing Enterprise Energy Corp. v. United States (In re Columbia Gas Sys.,

Inc.), 50 F.3d 233, 240 (3d Cir. 1995)). Under these circumstances, and upon consideration

of all the provisions of the 1989 Settlement Agreement set forth in more detail above, the

Court finds that, not only was the 1989 Settlement Agreement an executory contract, it was

subject to the provision of the Chapter 11 Trustee's First Amended Plan of Liquidation

which provided for the rejection, as of the Confirmation Date, of executory contracts.

Moreover, pursuant to 11 U.S.C. § 365(g)(1), the Chapter 11 Trustee's rejection of the 1989

Settlement Agreement constituted a breach of that agreement immediately before the date

of the filing of HVE's bankruptcy petition, resulting in an unsecured claim held by Mellen

Pride.

B. The Claims of Mellen Pride, NJDEP and the Mellens

An assessment of the types of claims, if any, held by Mellen Pride, the Mellens and

the NJDEP which are subject to the Court's order confirming the Chapter 11 Trustee's First

Amended Plan of Liquidation is critical to assessment and determination of the Settlement

Motion. The characterizations of Mellen Pride's claim as both a contingent, unliquidated

unsecured claim at the commencement of the case, or a claim arising out of a rejected

34

executory contract, namely the 1989 Settlement Agreement, is consistent with case law

analyzing claims.  A "debt" is a liability on a "claim." 11 U.S.C. § 101(12).  A "'claim' means

> (A) right to payment . . . or
>
> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured[.]

11 U.S.C. § 101(5).  In the environmental context, the Third Circuit in <u>Torwico Electronics,</u>

<u>Inc. v. State of NJ, Dept. of Envtl. Protection (In re Torwico Electronics Inc.)</u>, 8 F.3d 146 (3d

Cir. 1993), *cert. denied,* 511 U.S. 1046 (1994), adopted a distinction employed by the Second

Circuit in <u>U.S. v. The LTV Corp. (In re Chateaugay Corp.)</u>, 944 F.2d 997 (2d Cir. 1991).  The

Third Circuit stated:

> "EPA is entitled to seek payment if it elects to incur cleanup costs itself, but it has no authority to accept a payment from a responsible party as an alternative to continued pollution. Thus, a cleanup order that accomplishes the dual objectives of removing accumulated wastes and stopping or ameliorating ongoing pollution emanating from such wastes is not a dischargeable claim. It is true that, if in lieu of such an order, EPA had undertaken the removal itself and sued for the response costs, its action would have both removed the accumulated waste and prevented continued pollution. But it is only the first attribute of the order that can be said to remedy a breach that gives rise to a right to payment. Since there is no option to accept payment in lieu of continued pollution, any order that to any extent ends or ameliorates continued pollution is not an order for breach of an obligation that gives rise to a right of payment and is for that  reason not a 'claim.' *But an order to clean up a site, to the extent that it imposes obligations distinct from any obligation to stop or ameliorate ongoing pollution, is a 'claim' if the creditor obtaining the order had the option, which CERCLA confers, to do the cleanup work itself and sue for response costs, thereby converting the injunction into a monetary obligation.*"

<u>Torwico</u>, 8 F.3d at 149-50 (quoting <u>Chateaugay</u>, 944 F.2d at 1008) (emphasis supplied,

footnote omitted).   Extrapolating from the italicized language and its reference to the

Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42

U.S.C. § 9601 et seq. ("CERCLA"), it is evident, as the Liquidating Supervisor argued in his

Omnibus Response, that the NJDEP was the holder of a prepetition claim against the

Debtors' bankruptcy estates.   The ACO unequivocally gave the NJDEP a right to access the

New Jersey Site for purposes of undertaking the cleanup for which HVE provided financial

assurance in the amount of the estimated cost of that cleanup.   Additionally, in its

November 7, 2007 letter, the NJDEP admitted as much when it indicated that it "may

perform the remediation of the site using the funds in the remediation funding source."

In In re IT Group, Inc., Co., 339 B.R. 338 (D. Del. 2006), the court determined that an

injunction entered pursuant to confirmation of the debtors' plan barred an enforcement

action against a predecessor of the IT Litigation Trust, by the NJDEP, despite language in

an administrative order virtually identical to the language in the ACO with respect to

debts, damage, claims and penalties that were not to be discharged in bankruptcy.

According to the United States District Court for the District of Delaware,

> The NJDEP contends that the Administrative Order is an affirmative
> injunction against the Debtors requiring them to create 57 new acres of
> wetlands, and not a claim for monetary damages. The Court disagrees. The
> Debtors in this case have ceased operations, and their remaining assets have
> been vested in the Trust which was established under the Plan for the limited
> purpose of liquidating and distributing the Debtors' remaining assets to
> creditors holding allowed claims. Thus, the only way for the Trust to comply
> with the Administrative Order is for the Trust to render the payment of
> money. See Ohio v. Kovacs, 469 U.S. 274, 282-283, 105 S.Ct. 705, 83 L.Ed.2d
> 649 (1985).

IT Group, Inc., Co., 339 B.R. at 342 (footnote omitted).  Like the debtors in IT Group, HVE's

affiliate ceased operations at the New Jersey Site many years ago. Although the remediation efforts are incomplete, there was no evidence of continuing contamination through operations at the Site by Mellen Pride or for that matter any contamination by Mellen Chemicals, Inc. before the 1989 sale of the Property to Mellen Pride.[10]  Thus, the Court concludes that the ACO executed by the NJDEP and HVE most closely resembles a claim for monetary damages, although contamination at the site, despite years of remediation, has been described as "on-going."  Despite repeated notices of the Debtors' bankruptcy cases and all pertinent deadlines, the NJDEP failed to file a proof of claim.

In view of the foregoing, it follows that, if the NJDEP holds a claim against the Debtors' bankruptcy estates, both the Mellens and Mellen Pride also have claims, particularly because they, together with HVE, were parties to the 1989 Settlement Agreement.  In other words, the financial assurance provided by HVE, now part of the Remediation Trust and the subject of the Settlement Motion, was a form of liquidated damages in the event HVE failed to honor its obligations under the ACO and the NJDEP was required to cleanup the site.  That same financial assurance protected the Mellens as Ordered Parties and Mellen Pride as a party to the 1989 Settlement Agreement.  When the original $6 million dollar amount provided as financial assurance was reduced and the Debtors filed bankruptcy for the second time, Mellen Pride failed to take appropriate and timely steps to share in the distributions from the Debtors' solvent, substantively

---

[10] The contamination at the Property is ongoing in the sense that the remediation efforts by HVE have been unsuccessful.  The contamination is not ongoing in the sense that HVE's affiliate is continuing to pollute the Property.

consolidated estates.  Mellen Pride, like the NJDEP, was given notice of all pertinent dates

in the Debtors' bankruptcy cases.  *See* Arch Wireless, Inc. v. Nationwide Paging, Inc. (In re

Arch Wireless, Inc.), 534 F.3d 76, 82 (1st Cir. 2008) ("The Bankruptcy Rules specify that

known creditors must receive: (1) notice of deadlines for filing proofs of claims (bar date),

Fed. R. Bankr.2002(a)(7); (2) a copy of the reorganization plan, Fed. R. Bankr.3017(d); (3)

notice of the confirmation hearing, Fed. R. Bankr.3017(d); and (5) [sic] the confirmation

order, Fed. R. Bankr.2002(f)."), yet it waited until the eleventh hour to object to the

Settlement Motion.

Unlike Mellen Pride and the NJDEP, however, the Mellens did not receive notice in

conformance with the requirements set forth in Arch Wireless.  Mr. Mellen's

representations in his Affidavit were unrebutted with respect to the couple's change of

address and employment of Riker Danzig.  Unlike both the NJDEP and Mellen Pride, the

Mellens sought leave to file a proof of claim

As noted above, Mellen Pride (doing business as Pride Solvents & Chemical

Company) was given notice of applicable bar dates, as well as the date and time of the

confirmation hearing and the deadline for objecting to confirmation of the plan.  Moreover,

numerous notices were sent to Mellen Chemicals, Inc. at the location of Mellen Pride's

business address at the New Jersey Site.  Mellen Pride took no steps to clarify the status of

its 1989 Settlement Agreement with HVE or to protect and assert its rights by filing a proof

of claim or commencing an adversary proceeding for declaratory or injunctive relief.  HVE

successfully petitioned the NJDEP to reduce the financial assurance under the ACO from

38

$6 million to $1.42 million.  Coupled with notice of the bankruptcy petition filed by HVE,

Mellen Pride was provide with numerous "red flags" that its rights, as well as the cleanup

at the New Jersey Site, were affected.

C. The Settlement Motion

_____The United States Court of Appeals for the First Circuit articulated the standard for

assessing settlements under Fed. R. Bankr. P. 9019 in In re Healthco Int'l, Inc., 136 F.3d 45

(1st Cir. 1998), a case cited by both the Liquidating Supervisor and Mellen Pride.  It stated:

> The bankruptcy court essentially is expected to "'assess [ ] and balance the
> value of the claim[s] . . . being compromised against the value . . . of the
> compromise proposal.'" Jeffrey v. Desmond, 70 F.3d 183, 185 (1st Cir. 1995)
> (citation omitted). It may consider, among other factors: (1) the probability
> of success were the claim to be litigated-given the legal and evidentiary
> obstacles and the expense, inconvenience and delay entailed in its
> litigation-measured against the more definitive, concrete and immediate
> benefits attending the proposed settlement, see Kowal [Malkemus (In re
> Thompson)], 965 F.2d [1136] at 1141 n. 5, 1145 [(1st Cir. 1992)] (so-called "best
> interests" standard); (2) a reasonable accommodation of the creditors' views
> regarding the proposed settlement; and (3) the experience and competence
> of the fiduciary proposing the settlement. See Jeffrey, 70 F.3d at 185; In re
> Texaco, Inc., 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988) (citing Protective
> Committee for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,
> 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968)).

Id. at 50.  See also In re Fibercore, Inc., 391 B.R. 647 (Bankr. D. Mass. 2008).  "When

considering . . . [a settlement] . . ., deference should also be given to the Trustee's judgment

regarding the settlement, Hill v. Burdick (In re Moorhead Corp.), 208 B.R. 87 (1st

Cir.BAP1997), provided that the trustee can demonstrate that the proposed compromise

falls within a 'range of reasonableness.'" Fibercore, Inc., 391 B.R. at 655 (citing  In re

Whispering Pines Estates, Inc., 370 B.R. 452, 461 (1st Cir. BAP 2007), and In re 110 Beaver

St. P'ship, 244 B.R. 185, 187 (Bankr.D.Mass.2000)).

As the First Circuit stated in Healthco, the factors set forth by the court in Jeffrey v. Desmond, are not exclusive. 136 F.3d at 50.  In In re Telcar Group, Inc., 363 B.R. 345 (Bankr. E.D.N.Y. 2007), the court added public policy as a factor to consider, stating that it was "obliged to consider the public policy implications of the settlement, whether or not the issue is raised at all, much less by a non-party."  Id. at 353.  In that case, the court disapproved a trustee's settlement with the debtor's principal and sole financial decision maker, finding that the payment by the principal to the trustee in exchange for a release of all claims and a stake in litigation in which the principal might be compelled to testify as a fact witness violated 18 U.S.C. §201(c)(2), which criminalizes payment of anything of value for testimony under oath at a trial, hearing or other proceeding.

Mellen Pride maintained that the Liquidating Supervisor failed to support his Settlement Motion with a detailed analysis of the strengths and weaknesses of the Settlement Motion.  The Court disagrees.  Based upon the case law developed after Ohio v. Kovacs, 469 U.S. 274 (1985),[11]  in cases such as Torwico Electronics, Inc. v. State of NJ,

_____

[11] In Ohio v. Kovacs, the Supreme Court interpreted 11 U.S.C. § 101(5)(B), which defines the term "claim."  In that case, the State of Ohio had obtained a judgment in state court against Kovacs for violations of environmental laws at a hazardous waste disposal site. As noted by the court in Matter of Udell, 18 F.3d 403, 406 (7th Cir. 1994), the judgment included an injunction to stop further pollution;  an injunction to clean up the site; and an order to pay the State of Ohio $75,000. When Kovacs failed to comply with the judgment, the State of Ohio obtained the appointment of a receiver who took possession of the property and began cleaning up the site. Kovacs filed a Chapter 7 petition before the receiver had completed his task. The question addressed by the Supreme Court was whether the cleanup order was a "claim."
The Supreme Court found that Ohio had effectively converted its cleanup order

Dept. of Envtl. Protection (In re Torwico Electronics Inc.), 8 F.3d 146 (3d Cir. 1993), *cert.*

*denied,* 511 U.S. 1046 (1994), and U.S. v. The LTV Corp. (In re Chateaugay Corp.), 944 F.2d

997 (2d Cir. 1991), this Court is convinced that the NJDEP was remiss in failing to file a

proof of claim in view of the provisions of the ACO concerning financial assurance and its

ability to remedy the environmental pollution and compensate itself from the Remediation

Trust.

To repeat, the NJDEP had notice of all applicable deadlines and events in the

Debtors' Chapter 11 cases and elected not to file a proof of claim.  The Liquidating

Supervisor's transfer of the $1.42 million available in the Remediation Trust to the NJDEP

in exchange for a full and complete release is eminently reasonable in view of the

Affidavits submitted by Mellen Pride's own expert as to the potential cost of the cleanup

at the Property.  Indeed, the Liquidating Supervisor's settlement with the NJDEP reflects,

in this Court's view, the weakness of the NJDEP's initial position that its cleanup order was

not a claim.  Conversely, the Liquidating Supervisor's settlement agreement with the

Mellens reflects the strength of their position. In short, his settlement reflects the

---

into a demand for money damages because after the appointment of the receiver, the
only performance which the State of Ohio sought from Kovacs was "a money payment
to effectuate the . . . clean up." 469 U.S. at 282 (quoting from In re Kovacs, 717 F.2d 984,
987 (6th Cir. 1983).  The Court determined that because the cleanup order had given rise
to a right to payment, the order was a "claim" dischargeable in the debtor's Chapter 7
bankruptcy case.  The Supreme Court specifically did not decide, as courts such as the
court in Udell noted the issue of whether the injunction against further pollution was
also a "claim." 469 U.S. at 284.

probability of success were the claims to be litigated, despite the complexity of the issues

at the interface of bankruptcy and environmental laws, because the Mellens did not receive

notice of the applicable deadlines in time to protect their rights.

Based upon the pleadings submitted by the Liquidating Supervisor, the Court also

finds that it is unrebutted that he accommodated the views of the committee of equity

security holders.  Moreover, the Liquidating Supervisor has the requisite experience and

competence to negotiate favorable settlements.  His achievements in the Debtors' cases

demonstrate that he has more than ample ability to exercise his business judgment for the

benefit of the beneficiaries of the Liquidating Trust.  That business judgment is entitled to

deference.  In re Fibercore, Inc., 391 B.R. at 655 (citation omitted).

Mellen Pride argued that allowance of the Settlement Motion would violate public

policy.  The Court finds, however, that the State of New Jersey is in the best position to

promote and protect its policies concerning environmental issues.  The NJDEP entered into

the ACO with HVE and the Mellens.  Its decision to enter into a settlement agreement with

the Liquidating Supervisor signals that it is satisfied that it is not violating New Jersey's

public policy.  Although Mellen Pride would be free to challenge the NJDEP's decision in

the appropriate state or federal court forum, this Court will not "second guess" the

decision of the NJDEP and thwart an agreement that benefits the interests of the equity

security holders in the Debtors' solvent, substantively consolidated cases.

In sum, the Court finds that the Settlement Agreement with the NJDEP and the

Settlement Agreement with the Mellens are fair and reasonable and satisfy the factors set

forth by the First Circuit in <u>Healthco Int'l, Inc.</u> and <u>Jeffrey v. Desmond</u>.  Accordingly, the

Court shall enter an order granting the Settlement Motion.

D. The Abandonment Motion

Although the Liquidating Supervisor has settled with the NJDEP, he, nonetheless,

seeks entry of an order granting the Abandonment Motion, thereby permitting him to

abandon to the NJDEP the Debtors' interest in the funds held in the Remediation Trust to

secure the Debtors' performance with respect to the New Jersey Site.  In view of the

provisions of 11 U.S.C. § 544 and the Supreme Court's decision in <u>Midlantic Nat'l Bank v.</u>

<u>New Jersey Dep't of Envtl. Prot.</u>, 474 U.S. 494 (1986), the Court concludes that the

Liquidating Trustee's Motion lacks merit.

In <u>Midlantic</u>, Justice Rehnquist, writing for the minority, observed:

> Under the former Bankruptcy Act, title to the debtor's property vested in the
> trustee. Abandonment divested the trustee of title and revested it in the
> debtor. 4 Collier ¶ 554.02[2]. Under the Code, the trustee no longer takes title
> to the debtor's property, and he is simply divested of control over the
> property by the abandonment. <u>Ibid.</u> Although § 554 does not specify to
> whom the property is abandoned, the legislative history suggests that it is to
> the person having a possessory interest in the property. S.Rep. No. 95-989,
> p. 92 (1978); <u>Ohio v. Kovacs</u>, 469 U.S. 274, 284-285, n. 12, 105 S.Ct. 705,
> 710-711, n. 12, 83 L.Ed.2d 649 (1985).

474 U.S. at 508 n. 1.  Similarly, in <u>In re Pilz Compact Disc., Inc.</u>, 229 B.R. 630 (Bankr. E.D.

Pa. 1999), the court, quoting a leading commentator, observed:

> "Abandonment under Code § 554 removes property from the bankruptcy
> estate and returns the property to the debtor as though no bankruptcy
> occurred. Since "an order of abandonment acts only as an abandonment of
> the estate's interest in the property and not as an abandonment of the
> debtor's interest," the debtor's title to the abandoned property after
> abandonment is effective, nunc pro tunc, as of the date of the filing of the

43

petition.

"Under the prior Bankruptcy Act, abandonment was addressed piecemeal throughout the Act. Section 70 of the former Bankruptcy Act vested title to all of the debtor's nonexempt property in the trustee upon the filing of the petition. Title, therefore, was deemed to revest in the debtor upon abandonment.  In contrast, under the Code, an estate composed of all of the debtor's interest in property is created upon the filing of the petition or the entry of an order for relief pursuant to Code § 541(a).

"The trustee has control of the property, not title to the property, and Code § 554 simply divests the trustee of that control. Thus, abandonment of property of the estate may be sought by the trustee, the debtor in possession, or any other party in interest.

"Although the legislative history indicates that property of the estate may be abandoned to any party with a possessory interest in the property, as well as to the debtor, such abandonment of the estate's interest to a specific nondebtor entity is inconsistent with the concept of abandonment under the Code. The abandonment process was intended under the Code to simplify case administration by restoring the debtor's prepetition interest in the abandoned property.

"The debtor's interest under state law may be subject to competing claims to title or interests of third parties in the property. Abandonment was not intended as a process to determine and resolve conflicts regarding who has title to the abandoned property or the validity of competing liens or other interests of third parties in the property. The determination of competing claims to the abandoned property must be made either by the state courts after abandonment, or by adversary proceeding procedure under Bankruptcy Rule 7001.

"The only determination made by the trustee and the court in the § 554 abandonment process is that the property is (1) burdensome to the estate, or (2) of inconsequential value. In making this determination, the trustee is guided by the best interests of the estate, not necessarily the interests of the debtor and creditors."

Pilz Compact Disc, Inc., 229 B.R. at 638-39 (quoting 3 Norton Bankruptcy Law and Practice

2d, § 53.1, at 53-2 to 53-4 (1997) (footnotes omitted) (emphasis added). *See also* In re

44

Dewsnup, 908 F.2d 588, 590 (10th Cir. 1990)() ("Property abandoned under this section ceases to be part of the estate . . . It reverts to the debtor and stands as if no bankruptcy petition was filed. "), *aff'd*, 502 U.S. 410 (1992); In re Renaissance Stone Works, L.L.C., 373 B.R. 817, 820 (Bankr. E.D. Mich. 2007) ("There is no authority in the Bankruptcy Code for the abandonment of property of the estate to a creditor or to any party other than the debtor.").

With these precepts in mind, the Court concludes that it lacks authority to enter the Abandonment Motion filed by the Liquidating Supervisor.   Upon approval of the Settlement Motion, however, the NJDEP shall receive the $1.42 million in the Remediation Trust.  Thus, no contingent reversionary interest in the Remediation Trust will remain and no purpose will be served by the continuation of the Remediation Trust.  Accordingly, the Court shall enter an order denying the Abandonment Motion without prejudice to the filing of a motion to terminate the Remediation Trust.

**V. CONCLUSION**

In accordance with the foregoing, and treating the Abandonment Motion, the

Settlement Motion and Mellen Pride's Objection to the Settlement Motion as cross-motions

for summary judgment, the Court shall enter orders overruling the Objection of Mellen

Pride, granting the Settlement Motion, and denying the Abandonment Motion.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:   November 7, 2008